UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| OHIO SKILL GAMES, INC., | ) | CASE NO. 08-60560 |
| | ) | |
| Debtor. | ) | ADV. NO. 08-6049 |
| | ) | |
| OHIO SKILL GAMES, INC., | ) | JUDGE RUSS KENDIG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT INTENDED FOR** |
| PACE-O-MATIC, INC., | ) | **PUBLICATION)** |
| | ) | |
| Defendant. | ) | |

Now before the Court are cross-motions for partial summary judgment filed by Defendant Pace-o-Matic, Inc. ("Defendant" or "POM") and Plaintiff Ohio Skill Games ("Plaintiff" or "OSG"). The parties submitted the instant motions at the request of the Court to resolve the threshold legal issue of whether a contract between the parties was partially terminated by a statutory change in Ohio effective October 25, 2007. On November 18, 2008, the Court held a hearing on Plaintiff's Motion to Compel Discovery Responses, filed November 6, 2008. At that hearing, it became apparent that resolution of this threshold issue was necessary not only to proceed to the merits of the other causes of action in Plaintiff's Amended Complaint, but even to discovery on the remaining issues.

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. 157(b)(2)(O). The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

### FACTUAL AND PROCEDURAL BACKGROUND

OSG is the debtor and debtor-in-possession in the underlying chapter 11 case in which this adversary arises. It is an Ohio corporation doing business in multiple states, but only its operations in Ohio are at issue in the instant matter. POM describes itself as a Georgia-based developer and manufacturer of skill-based amusement games that utilize

1

POM's proprietary software.

On April 29, 2007, OSG and POM entered into an agreement (the "License Agreement") under which OSG agreed to distribute the games, and to meet certain benchmarks for doing so, in Ohio, Massachusetts, Michigan, and Hawaii. OSG acted as distributor for POM, and used its business contacts in Ohio to get POM's products places in locations throughout the state. Salient among these, and the only one mentioned by the parties by name, was a game called Tic Tac Fruit, based off the tac-tac-toe concept. OSG entered into agreements with operators who placed approximately 3,500 skill games in various business locations.

Both parties anticipated that the games that they manufactured and distributed could be subject to legal or legislative challenge. In Ohio, they were subject to both. The Ohio Attorney General's office brought a legal challenge to the games under Ohio's gambling laws, alleging that they were games of chance, not skill; OSG hired an attorney, Kurt Gearheiser ("Gearheiser") to defend the games, and won a judgment that the games were "skill-based amusement machines," not games of chance, under the pertinent Ohio statute.

Soon thereafter, however, the Ohio legislature enacted HB 177, which changed the statutory definition of skill games to exclude any device awarding cash, as well as any game awarding merchandise or redeemable vouchers as the result of a single play of a machine with a wholesale value above ten dollars. The bill was enacted into law in October of 2007 and took effect on October 25, 2007.

Prior to amendment, the Ohio Revised Code defined a "skill-based amusement machine" as follows:

> (AAA)(1) "Skill-based amusement machine" means a skill-based amusement device, such as a mechanical, electronic, video, or digital device, or machine, whether or not the skill-based amusement machine requires payment for use through a coin or bill validator or other payment of consideration or value to participate in the machine's offering or to activate the machine, provided that all of the following apply:
>
>> (a) The machine involves a task, game, play, contest, competition, or tournament in which the player actively participates in the task, game, play, contest, competition, or tournament.
>>
>> (b) The outcome of an individual's play and participation is not determined largely or wholly by chance.
>>
>> (c) The outcome of play during a game is not controlled by a person not actively participating in the game.
>
> (2) All of the following apply to any machine that is operated as described in division (AAA)(1) of this section:

2

> (a) As used in this section, "task," "game," and "play" mean one event from the initial activation of the machine until the results of play are determined without payment of additional consideration. An individual utilizing a machine that involves a single task, game, play, contest, competition, or tournament may be awarded prizes based on the results of play.
>
> (b) Advance play for a single task, game, play, contest, competition, or tournament participation may be purchased. The cost of the contest, competition, or tournament participation may be greater than a single non-contest, competition, or tournament play.
>
> (c) To the extent that the machine is used in a contest, competition, or tournament, that contest, competition, or tournament has a defined starting and ending date and is open to participants in competition for scoring and ranking results toward the awarding of prizes that are stated prior to the start of the contest, competition, or tournament.

Ohio Rev. Code Ann. § 2915.01(AAA) (West 2007) (amended Oct. 25, 2007). Following the amendment effective October 25, 2007, that definition now reads differently:

> (AAA)(1) "Skill-based amusement machine" means a mechanical, video, digital, or electronic device that rewards the player or players, if at all, only with merchandise prizes or with redeemable vouchers redeemable only for merchandise prizes, provided that with respect to rewards for playing the game all of the following apply:
>
> (a) The wholesale value of a merchandise prize awarded as a result of the single play of a machine does not exceed ten dollars;
>
> (b) Redeemable vouchers awarded for any single play of a machine are not redeemable for a merchandise prize with a wholesale value of more than ten dollars;
>
> (c) Redeemable vouchers are not redeemable for a merchandise prize that has a wholesale value of more than ten dollars times the fewest number of single plays necessary to accrue the redeemable vouchers required to obtain that prize; and
>
> (d) Any redeemable vouchers or merchandise prizes are distributed at the site of the skill-based amusement machine at the time of play.

3

(2) A device shall not be considered a skill-based amusement machine and shall be considered a slot machine if it pays cash or one or more of the following apply:

> (a) The ability of a player to succeed at the game is impacted by the number or ratio of prior wins to prior losses of players playing the game.
>
> (b) Any reward of redeemable vouchers is not based solely on the player achieving the object of the game or the players score;
>
> (c) The outcome of the game, or the value of the redeemable voucher or merchandise prize awarded for winning the game, can be controlled by a source other than any player playing the game.
>
> (d) The success of any player is or may be determined by a chance event that cannot be altered by player actions.
>
> (e) The ability of any player to succeed at the game is determined by game features not visible or known to the player.
>
> (f) The ability of the player to succeed at the game is impacted by the exercise of a skill that no reasonable player could exercise.

(3) All of the following apply to any machine that is operated as described in division (AAA)(1) of this section:

> (a) As used in this section, "game" and "play" mean one event from the initial activation of the machine until the results of play are determined without payment of additional consideration. An individual utilizing a machine that involves a single game, play, contest, competition, or tournament may be awarded redeemable vouchers or merchandise prizes based on the results of play.
>
> (b) Advance play for a single game, play, contest, competition, or tournament participation may be purchased. The cost of the contest, competition, or tournament participation may be greater than a single noncontest, competition, or tournament play.
>
> (c) To the extent that the machine is used in a contest, competition, or tournament, that contest, competition, or

4

> tournament has a defined starting and ending date and is open to participants in competition for scoring and ranking results toward the awarding of redeemable vouchers or merchandise prizes that are stated prior to the start of the contest, competition, or tournament.
>
> (4) For purposes of division (AAA)(1) of this section, the mere presence of a device, such as a pin-setting, ball-releasing, or scoring mechanism, that does not contribute to or affect the outcome of the play of the game does not make the device a skill-based amusement machine.

Ohio Rev. Code. § 2915.01(AAA). The changes were relevant to the games manufactured by POM and distributed by OSG, because Tic Tac Fruit, in its incarnation before the amendment of the statute, would sometimes award vouchers redeemable for cash prizes that exceeded the sum of ten dollars, which were and are now banned by § 2915.01(AAA)(1)(a), and the statute elsewhere defines "merchandise prizes" to explicitly exclude, *inter alia*, cash prizes. Ohio Rev. Code. § 2915.01(BBB)(1).

Because the games in question, including Tic Tac Fruit, did not meet the new definition of "skill-based amusement machines," they were now forbidden by the Ohio statute prohibiting "schemes of chance." Ohio Rev. Code. § 2915.02. The statute defines a "scheme of chance" to expressly exclude "a skill-based amusement machine," Ohio Rev. Code § 2915.01(C), but the amendment narrowed the scope of that exclusion, and neither party contests that that narrowing at least partially proscribed the games in their current form at the time. The parties differ, however, as to the degree of the new proscription.

The License Agreement between the parties provides two provisions dealing with legal problems that the games might encounter:

> 2.4 <u>Changes</u>. Manufacturer reserves the right to replace or modify the Covered Games or Software in the Exclusive Territory to address legal compliance or market acceptability issues, upon acceptance by Distributor, which will not be unreasonably withheld.
>
> ...
>
> 5.2 <u>Other Termination</u>. This Agreement shall be deemed partially terminated with respect to any State in the Exclusive Territory into which Distributor has sold Covered Games to the extent statutory change or judicial interpretation hereafter prohibits the use of any Covered Game or skill-based amusement device generally in such State and as provided in Section 2.1 above.

After the law was changed, representatives of OSG and POM met with Gearheiser to discuss ways to modify the existing games to bring them into compliance with the new version of § 2915.01. They determined that the games themselves could continue to operate as long as the prizes awarded were modified. Mr. Gearheiser issued legal opinions in letters dated December 4, 2007 and December 27, 2007, opining that he believed the new prize

5

scheme to be legal, and that this brought the modified games back into compliance with Ohio law. At this time, the State of Ohio was in possession of the assets of OSG, having seized them prior to the enactment of HB 177. The parties at that meeting therefore also determined that POM would temporarily service the games in Ohio. Ohio returned OSG's assets at some point in 2008 in response to a state court order.

In an undated letter in February of 2008, POM sent OSG a notice of termination of the License Agreement. In response, OSG's counsel sent POM's counsel a letter disputing that there were any grounds for such a termination. Neither § 2.4 nor § 5.2 were mentioned in either of these letters; the initial letter from POM invoked the 30-day notice period for termination for cause of the contract contained within § 5.1 of the Agreement, and the response denied the existence of such cause.

According to the Declaration of Michael Pace, president of POM, "the [games] existing in Ohio as of October 25, 2007 were turned off and their operations were discontinued." (Pace Decl. ¶ 12.) According to the Affidavit of Kurt Gearheiser, however, "[m]any of the Ohio skill game operators continue in business today operating the machines, as modified with respect to the prizes which could be awarded, and are now being serviced by Pace-o-Matic." (Gearheiser Aff. ¶ 10.)

## LEGAL ANALYSIS

### I. Standard of Review

Motions for summary judgment are governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56. That rule provides, in part:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

The evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H.Kress & Co., 398 U.S. 144, 158-59 (1970). Summary judgment is not appropriate if a material dispute exists over the facts, "that is, if evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

6

## II. The Automatic Termination Provision and the Amendment of the Ohio Statute

The Agreement's automatic termination clause was not terminated by the change in the Ohio gambling statute on October 25, 2007. Both parties' conduct suggests that they are well aware of this fact, and POM is attempting to retroactively argue that it believed, and believes, something that its actions belie.

By its terms, § 5.2 of the Agreement is only triggered when "statutory change or judicial interpretation hereafter prohibits the use of any Covered Game or skill-based amusement device *generally*" (emphasis added) in a covered state. Ongoing modifications to the games to comply with changing legal requirements, whether statutory or judicial, were clearly contemplated by the parties in § 2.4, and according to the affidavits presented by the defense, which the Court has no reason to doubt, that is exactly what happened from October 25, 2007 through early February of 2008. As POM notes in its response to OSG's motion for partial summary judgment, automatic termination under § 5.2 of the Agreement is premised upon *either* the prohibition of a Covered Game, specifically, or a "skill-based amusement device" generally. It is less than apparent to the Court how POM proceeds from this to argue that OSG's reading of the Agreement would render the more specific term "Covered Game" in that section superfluous or fail to give it meaning. If Tic Tac Fruit (a Covered Game) were specifically outlawed, the provision would trigger; if all games similar to Tic Tac Fruit were generally outlawed, the provision would likewise trigger. Neither of those has happened, however.

While they are now being serviced by POM directly, most of the games distributed by OSG remain at the operators' sites and continue to generate revenue, with the only modification being to what the players can win, not to the actual game. In addition, the law changed in October of 2007, and yet POM not only did not send OSG its notice of termination until February of 2008, but it did not invoke the automatic termination clause in that notice, invoking instead the termination for cause clause that required 30 days' notice to the parties. Had the agreement in fact terminated months prior to that letter, there would have been no need to invoke that clause, and at the very minimum, that clause would have been invoked in the alternative. Prior to sending the notice of termination in February, POM met with OSG to discuss modification of the games to bring them back into compliance with the law, which was done by simply modifying the prizes awarded: the prizes now included no cash prizes and gas cards worth $10 and less. The Court cannot find that the reduction in the permissible value of prizes and the nature of permissible prizes amounted to "prohibiting [the games] generally" within the scope of the Agreement. It strains credulity to suggest that the Agreement's self-destruct mechanism had so sensitive a trigger; this was a lucrative arrangement for both parties, and their conduct between October of 2007 and February of 2008 strongly suggests an interest in continuing to keep the games running. If a government were to outlaw prizes of greater than $1 million at golf tournaments, it would be absurd to argue that that government was thereby outlawing golf.

When bankruptcy courts interpret contracts, they apply the contract interpretation principles of the appropriate state law. See Rieser v. Baudendistel (In re Buckeye Countrymark, Inc.), 251 B.R. 835, 838 (Bankr. S.D. Ohio 2000). If a contract contains a choice of law provision, that will generally govern the parties' agreement; if not, the court

7

applies a "significant contacts" analysis to determine which state's law to apply. Id. at 838-39; Limor v. Weinstein & Sutton (In re SMEC, Inc.), 160 B.R. 86, 91 (M.D. Tenn. 1993). The significant contacts test requires the court to determine which state has the most substantial relationship to the contract; to do so, the court may consider the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the places of business of the parties. Rieser at 839. The Court does not have sufficient information to know where the contract was negotiated or executed. One party is an Ohio corporation; the other is a Georgia corporation, so this factor is in equipoise. The contract was performed in both Ohio and Georgia (and in other states, as the contract applied independently to each covered territory), but the greater part of the performance occurred in Ohio. Most importantly, however, the location of the subject matter of the contract–the gaming machines themselves–is Ohio. Installation of the later modifications to the machines also occurred in Ohio. The Court will therefore apply Ohio law in interpreting the contract.

Under Ohio law, an interpretation of a contract that would render a provision meaningless "is neither acceptable nor desirable under the normal rules of contract construction." Hybud Equip. Corp. v. Sphere Drake Ins. Co., 597 N.E.2d 1096, 1103 (Ohio 1992). POM's theory–that the modification in the permissible prize structure invalidated the entire agreement as to Ohio–would make § 2.4 of the agreement superfluous. POM could never take advantage of the "right to replace or modify the Covered Games or Software in the Exclusive Territory to address legal compliance ... issues" if the very fact that the need to replace or modify the games to address legal compliance issues arose terminated the entire agreement with respect to a given state.

Defendant also argues against Plaintiff's argument on the ground that § 7.3 of the Agreement requires all amendments or modifications of the Agreement to be in writing and signed by the parties, and no agreement regarding modification of the Covered Games was ever written and signed by the parties in the months following the change in the Ohio statute. Defendant's argument is acarpous for two reasons. First, § 7.3 requires modifications to the *Agreement* to be in writing. Plaintiff is not contending that the Agreement was ever amended or modified, however. The prize structure of the Covered Games is nowhere to be found in the Agreement, and that is the only thing that appears to have been modified at all. Plaintiff's argument is based on the Agreement as written, not as putatively modified. In addition, Plaintiff need not go so far as to say that replacement or modification of the games under § 2.4 was actually *implemented* to make its argument, whether or not this would require a subsequent written agreement before modification work on the games installed across Ohio could begin. That is of only peripheral consequence to the real thrust of Plaintiff's argument: that § 2.4 could *never* be triggered, could never even give rise to the *right* to replace or modify the Covered Games, if the entire Agreement (including § 2.4) were instantly and automatically invalidated upon such an inconsequential change in the law.

Defendant cites not a single case in support of its argument outside of the familiar cases setting forth the standard for summary judgment and enforcing contract provisions as written. The Court also notes that Defendant refrains from making more forceful arguments that the continued operation of the game, even with the changes in prizes, became illegal under other modifications to the statute, such as the changes to the definition of a skill-based

8

amusement machine in the revised version of § 2915.01(AAA)(2), that would prohibit the actual operation of the game, not just the awarding of prizes above a certain amount.

## III. Conclusion

The Agreement was not automatically terminated with respect to Ohio by the change in Ohio's statute effective October 25, 2007. This was the sole legal issue before the Court. (Order Setting Briefing Schedule, Nov. 21, 2008.) Some of the exhibits produced seemed to speak more towards Defendant's putative termination of the contract in February of 2008 under § 5.1; the Court makes no ruling on this issue.

The Court's order of November 21, 2008 also held Plaintiff's Motion to Compel Discovery Responses in abeyance pending resolution of the automatic termination issue. The Court will enter a separate order resetting that motion for a status conference, as well as any remaining issues with respect to the termination of the Agreement that the parties wish to pursue further.

An order consistent with this opinion will be entered contemporaneously.

/s/ Russ Kendig
--------------------------
RUSS KENDIG
U.S. BANKRUPTCY JUDGE

**Service List:**

Michael J Moran
Gibson & Lowry
PO Box 535
234 Portage Trail
Cuyahoga Falls, OH 44222

Jean Robertson
Ronald M. McMillan
Calfee, Halter & Griswold LLC
1400 KeyBank Center
800 Superior Avenue
Cleveland, OH 44114

Pace-O-Matic, Inc.
4150 Blue Ridge Industrial Pkwy
Norcross, GA 30071

Ohio Skill Games Incorporated
P.O. Box 724
Massillon, OH 44708