# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| OHIO SKILL GAMES INCORPORATED, | CASE NO. 08-60560 |
| Debtor(s). | JUDGE RUSS KENDIG |
| OHIO SKILL GAMES INCORPORATED, | ADV. NO. 08-6049 |
| Plaintiff(s), | |
| v. | |
| PACE-O-MATIC, INC., | |
| Defendant(s). | |

## MEMORANDUM OF LAW IN SUPPORT OF PACE-O-MATIC, INC.'S SECOND MOTION FOR SUMMARY JUDGMENT

Pace-O-Matic, Inc. ("POM"), by and through its undersigned counsel hereby submits this Memorandum of Law in support of Pace-O-Matic, Inc.'s Second Motion for Summary Judgment (the "Motion for Summary Judgment") against Ohio Skill Games Incorporated (the "Debtor"), the plaintiff in this adversary proceeding and debtor in the above-captioned bankruptcy case, and states as follows:

### I. Preliminary Statement and Summary of Argument

POM is entitled to summary judgment because applicable federal trademark and federal copyright law prohibit the Debtor from assigning the Amended and Restated Master Software License and Distribution Agreement (the "License Agreement") without POM's consent, therefore Section 365(c)[1] bars the Debtor from assuming the License Agreement and the License Agreement must be rejected. The rejection of the License Agreement constitutes a breach that precludes the Debtor from enforcing its rights under the License Agreement. In addition,

---

[1] All references to statutory sections are to the United States Bankruptcy Code unless otherwise noted.

{00770918.DOC;1 }

prepetition, the Debtor defaulted on both monetary and non-monetary performance obligations under the License Agreement which independently preclude the Debtor from enforcing any rights under the License Agreement.

Section 365(c)(1) allows "applicable law" to excuse a party "from accepting performance from or rendering performance to" a third party absent such party's consent to assignment or assumption. The plain language of Section 365(c)(1) "links nonassignability under 'applicable law' together with a prohibition on assumption in bankruptcy." *In re Catapult Entm't, Inc.*, 165 F.3d 747, 749 (9th Cir. 1999), citing 1 David G. Epstein, Steve H. Nickles & James J. White, BANKRUPTCY § 5-15 at 474 (1992). In other words, Section 365(c)(1), by its terms, bars a debtor-in-possession from *assuming* an executory contract without the non-debtor's consent where applicable law precludes *assignment* of such contract to a third party. *Catapult*, 165 F.3d at 749. In this case, because the License Agreement granted the Debtor the right to use POM's trademarks and copyrights and because an assignment of POM's trademarks and copyrights without POM's consent is prohibited by applicable federal trademark and copyright laws which specifically protect POM from the non-consensual assignment of the trademarks and copyrights to a third party, the Debtor lacks the ability to assume the License Agreement as a matter of law. Accordingly, because as a matter of law the Debtor cannot assume the License Agreement, the License Agreement must be deemed rejected as of the Petition Date.

The Debtor has no right to enforce, postpetition, a contract which it has breached prepetition without first assuming that contract. Here, POM is entitled to summary judgment on the Debtor's claims both because the rejection of the License Agreement will be treated as a prepetition default and because the Debtor's prepetition monetary and non-monetary defaults preclude it from enforcing any rights under the License Agreement.

## II. Statement of Material Facts

### A. The License Agreement

1. POM is engaged in the business of designing, developing and licensing skill-based amusement games and the proprietary software needed to operate the games. Declaration of Michael R. Pace in Support of the Memorandum of Law in Support of Pace-O-Matic, Inc.'s Second Motion for Summary Judgment (the "Pace Declaration"), ¶ 2, a true and correct copy of which is attached hereto as Exhibit A.

2. On April 29, 2007, POM, as manufacturer and licensor, and the Debtor, as licensee and distributor, entered into the License Agreement. The License Agreement provided, among other things, for the Debtor to act as a distributor of certain of POM's skill-based amusement games, defined in the License Agreement as Covered Games, within the states of Ohio, Massachusetts, Michigan and Hawaii. Pace Declaration, ¶ 3. A true and correct copy of the License Agreement is attached to the Pace Declaration as Exhibit A.

3. The Covered Games operated through two means: (i) proprietary software developed by POM (the "Software") and (ii) an electronic "Fill System," which is a proprietary revenue generation refill system designed by POM that permits Operators (as defined in the License Agreement) to access additional plays or continued use on each Covered Game on a per play or other fee basis. Pace Declaration, ¶ 4.

4. Under the License Agreement, POM granted the Debtor a non-transferable, non-exclusive license of the Software and its trademarks and trade names used with the Covered Games (the "Marks") for limited purposes, such as to distribute and sublicense the Software to Operators. *License Agreement*, § 2.5(a). The License Agreement also granted the Debtor a non-transferable, non-exclusive license to access the Fill System in order to collect revenues and to

pay a portion of the revenues to POM. *License Agreement*, § 2.5(a). Section 2.5 of the License Agreement provides as follows:

> (a) During the Term and subject to the terms and conditions of this Agreement, Manufacturer hereby grants to Distributor a **non-transferable license (i) to distribute and sublicense copies of the Software solely to Operators on the terms provided in the Game Distributor Agreement and (ii) to access the Fill System**. Such license shall be **exclusive to Distributor within the Exclusive Territory** subject to the minimum Covered Game Placement and other performance requirements of this Agreement. In addition, Manufacturer grants to Distributor a **limited, non-transferable, non-exclusive**, **royalty-free right and license, without the right to sublicense, to use, but not to register, the trademarks and trade names** used with the Covered Games as designated by Manufacturer (the "Marks"), but only in direct relation to the Covered Games, and subject to Manufacturer's right to specify the method or manner in which Distributor may utilize the Marks. Except as permitted under this Agreement or the applicable Game Distributor Agreement, Distributor will not display or use the Marks nor permit the Marks to be displayed or used by any third party. Distributor shall not permit sub-sublicensing of the Software, and shall not sublicense the Fill System to any third party, except as expressly permitted by the terms of the applicable Game Distributor Agreement or with the prior written consent of Manufacturer, which consent shall not be unreasonably withheld. (Emphasis added).

5. The license to use the trademarks and trade names is expressly a non-exclusive, non-transferable right. *License Agreement*, § 2.5(a).

6. The license to use the Software and to access the Fill System is likewise non-exclusive and non-transferable. *License Agreement*, § 2.5(a). Although the license to use the Software and access the Fill System is termed as "exclusive" to the Debtor within the Exclusive Territory (defined as the states of Ohio, Massachusetts, Hawaii and Michigan), the license is non-exclusive because (a) it applies only to a limited geographic area and (b) the License Agreement does not restrict POM or Ultra Skill Games, LLC from operating Covered Games in that geographic area. Section 2.3(a) of the License Agreement provides,

> Nothing in this Agreement shall restrict manufacturer, directly or indirectly (including through its subsidiary, Ultra Skill Games, LLC ("USG") from operating Covered Games in the Exclusive Territory so long as (i) Distributor has not granted an exclusive right to an Operator to place Covered Games within a portion of such Exclusive Territory and (ii) Distributor shall have the right to provide Refills for such Covered Games (the "Covered Games") as provided in Section 4 below.

### B. Revenues and the Debtor's Monetary Contract Defaults

7. The License Agreement provided for the Debtor to purchase Covered Games from POM, to place those games with Operators, to sell Refills (as defined in the License Agreement) to Operators, and to collect the revenues generated from the sale of Refills (the "Revenues"). *License Agreement*, §§ 2.1, 2.2, 3.2, 4.1(b). The License Agreement required that POM collect and deposit all Revenues into a segregated account. *License Agreement*, § 4.1(c) ("Collected Revenues shall be immediately deposited into a segregated account designated and controlled by distributor (the 'Deposit Account').").

8. The License Agreement provided that the Debtor would pay POM its 50% share of the Revenues from the segregated account, subject to a percentage holdback for professional fees and expenses which were to be deposited in an escrow account. *License Agreement*, § 4.2. The Debtor was responsible for collecting the Revenues, paying POM its share of the Revenues, paying the professional fees and expenses and paying applicable sales and use taxes. *License Agreement*, § 4.1(b), 4.2.

9. Prepetition, the Debtor failed to pay POM its share of the Revenues, and it failed to pay the professional fees and expenses. Pace Declaration, ¶ 5.

10. The Debtor does not dispute that it failed to make payments to POM. In its Schedules of Assets and Liabilities, the Debtor identified several claims due to POM including a claim for $182,000 for "sales of software, program codes and miscellaneous items" and $160,000 for a "claim for contribution to legal defense fund." *See* Amended Schedule F, a copy of which is attached hereto as <u>Exhibit B</u>. Although in its Schedules the Debtor listed POM's claims as disputed, at the section 341 meeting, Grant Kowell conceded that most of POM's

$182,000 claim is due and unpaid.[2]  Section 341 meeting, audio CD at 19 minutes 50 seconds; unofficial partial Tr. at p. 11, attached hereto as <u>Exhibit C</u>.  Mr. Kowell testified, "Right.  The $180 some thousand, are for fills, and bills, I'd say almost 90% accurate.  There's a couple he's got on there traveling and entertainment and stuff that probably about $170,000 of that is owed and valid."  He also agreed that most of POM's claim for $160,000 in unpaid professional fees was due and owing.  Kowell Tr. at pp. 104-105 attached hereto as <u>Exhibit D</u>.  Mr. Kowell testified, "I'm saying it is really not going to – there is 160,000 owed toward that legal bill, but we have an offset number against that that is probably going to reduce that maybe down to 130 or 120."  The Debtor's failure to pay POM its share of the revenues and its claim for reimbursement of legal fees constitutes a default under the License Agreement.

11.  The Debtor also identified $151,927.91 in unpaid claims for legal services, which it did not schedule as disputed.  *See* Amended Schedule F.  The Debtor's failure to pay its professional fees constitutes a default under the License Agreement.

      **C.**      **The Debtor Diverted Revenues to its Principals**

14.  The Debtor's failure to pay its obligations to POM and to its professionals was due to the Debtor's diversion of Revenues out of the segregated account through the payment of large cash distributions to its three owners.  In October 2007, the Debtor was owned by Jay Young, Mildred Kowell and Jan Anasis, each of whom held a one-third interest in the Debtor.  During the twelve-month period preceding the Petition Date, the Debtor made the following distributions to its owners:

      a.      Jay Young - $562,000
      b.      Mildred Kowell - $562,000
      c.      Jan Anasis - $562,000

---

[2] Grant Kowell is the spouse of Mildred Kowell, who is the 100% owner of the Debtor and its President.  Grant Kowell allegedly was involved in the Debtor's prepetition operations, and according to the testimony at the 341 meeting, Grant Kowell is an agent of the Debtor.

A list of the distributions made to the owners is attached hereto as Exhibit E. In addition to making distributions to its owners, the Debtor also paid each of them monthly salaries of $6,000.³ *See* Exhibit F.

15.     The distributions identified in the preceding paragraph include payments the Debtor made to each to the three owners on October 15, 2007 in the amount of $30,000 each.

      **D.**      **Non-Monetary Contract Defaults**

16.     In its Counterclaim, POM identified a number of non-monetary defaults, at least one of which the Debtor has tacitly conceded. The License Agreement required the Debtor to use its best efforts to promptly terminate existing agreements with Operators and replace them with new game distributor agreements in the form of the document attached as Exhibit A to the License Agreement. *License Agreement*, § 7.3.⁴ In response to document requests, the Debtor did not produce any executed game distributor agreements that used the form of Exhibit A. In his deposition, when asked what efforts the Debtor undertook to replace existing game distributor agreements with new ones, Mr. Kowell responded that he thought they mailed them out to customers and waited for them to come back. He said, "I think we mailed everybody, but I don't want – everybody is the wrong word. Sent them out and waited for them to come back." Kowell Tr. at p. 58, line 25 to p. 59, line 2, a copy of which is attached hereto as Exhibit G. The Debtor's failure to use its best efforts to terminate existing agreements and replace them with new game distributor agreements constitute a default under the License Agreement.

---

³The Debtor's distributions to its owners were substantially higher than those that the Debtor disclosed on line 23 of its Statement of Financial Affairs. A copy of page 8 of the Debtor's Statement of Financial Affairs is attached hereto as Exhibit F.

⁴The License Agreement further required that no game distributor agreement entered into after April 27, 2007 differ in any material respect from the form in Exhibit A without POM's prior written consent. *License Agreement*, § 2.3(a).

### E. The Legislation and the Debtor's Post-Seizure Performance

17. In October 2007, the Ohio Legislature passed a bill amending Ohio Rev. Code § 2915.01(AAA) that changed the definition of a skill-based amusement machine ("HB 177"). HB 177 was signed into law by the Governor of Ohio on October 25, 2007 which made it illegal to play the Covered games that had been played in Ohio prior to that date.

18. Prior to the enactment of HB 177, Ohio state officials seized the property of the Debtor and froze its assets. *Disclosure Statement*, p. 5 [Docket No. 54 in Case No. 08-60560].

### III. Standards for Summary Judgment

Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 govern motions for summary judgment in adversary proceedings in the United States Bankruptcy Courts. In pertinent part, Rule 56(c) provides that:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Davison v. Roadway Exp., Inc.*, 2008 WL 2522340 *3 (N.D. Ohio June 26, 2008). A court may render summary judgment upon the whole case or only on a portion thereof under Fed. R. Civ. P. 56(d).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist and that judgment should be granted in its favor as a matter of law. *Celotex*, 477 U.S. at 322-23; *Davison v. Roadway Exp., Inc.*, 2008 WL 2522340 *3 (N.D. Ohio June 26, 2008). The movant must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-23.

While inferences drawn from the underlying facts will be viewed in a light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 586, the existence of a material factual dispute is sufficient to prevent summary judgment only if the disputed fact is determinative of the outcome under the applicable law. *Anderson*, 477 U.S. at 248.

If the moving party has presented evidence in support of his motion, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Hence, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

### IV.  Argument

**A.  Section 365(c)(1) Precludes the Debtor's Assumption of the License Agreement**

(1)  <u>The Debtor Cannot Assume a Contract that it Cannot Assign</u>

Section 365(a) sets forth the basic power of a trustee or debtor-in-possession to assume or reject any executory contract or unexpired lease of the debtor. Section 365(f)(1) generally permits a trustee or debtor-in-possession to assume and subsequently assign to a third party an executory contract or unexpired lease of the debtor without regard to any provision to the contrary in the executory contract or unexpired lease, or in applicable law[5] that "prohibits, restricts, or conditions the assignment of such contract or lease." 11 U.S.C. § 365(f)(1). However, this general assumption and assignment authority is subject to the carefully crafted exception found in Section 365(c)(1), which provides in pertinent part that:

---

[5] The term "applicable law" law used in Section 365(f)(1) refers to "general prohibitions barring assignment." *In re James Cable Partners, L.P.*, 27 F.3d 534, 538 (11th Cir. 1994); *see also In re Sunterra Corp.*, 361 F.3d 257, 266 (4th Cir. 2004) ("Section 365(f)(1) lays out the broad rule – a law that, as a general matter, 'prohibits, restricts, or conditions the assignment' of executory contracts. . . ."); *In re Catapult Entertainment, Inc.*, 165 F.3d 747, 752 (9th Cir. 1999) (same).

> (c) The trustee *may not assume or assign* any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) *applicable law* excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party *does not consent* to such *assumption or assignment*;

11 U.S.C. § 365(c)(1) (emphasis added).

In applying this section, most courts have held that a debtor or a trustee cannot assume a contract that it could not assign. *See In re Sunterra Corp.*, 361 F.3d 257, 266 (4th Cir. 2004); *In re Catapult Entertainment, Inc.*, 165 F.3d 747, 752 (9th Cir. 1999) *In re James Cable Partners, L.P.*, 27 F.3d 534, 538 (11th Cir. 1994); *In re West Electronics, Inc.*, 852 F.2d 79, 83 (3rd Cir. 1988). These courts apply what has been termed the "hypothetical test" and they adhere to the plain statutory language in examining whether, hypothetically without looking to the individual facts of the case, the executory contract could be assigned under applicable law. In summary, if the debtor-in-possession lacks the hypothetical authority to assign a contract, then it may not assume the contract notwithstanding whether the debtor-in-possession has no *actual* intention of assigning the contract to another. The hypothetical test is preferred by a majority of the Courts of Appeals that have addressed the issue.

The First Circuit Court of Appeals, which is the sole circuit court that has not followed the majority rule, has held that debtors can assume executory contracts that they are not able to assign. *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir. 1997); *Summit Investment & Development Corp. v. Leroux*, 69 F.3d 608, 612-13 (1st Cir. 1995).

The majority rule is clearly correct. In interpreting Section 365(c)(1), the Court must begin with the statutory language. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (noting that the statutory language is the "cardinal

08-06049-rk    Doc 72    FILED 03/12/10    ENTERED 03/12/10 16:22:09    Page 10 of 20

canon" to be addressed "before all others"). The plain language of Section 365(c)(1) "links nonassignability under 'applicable law' together with a prohibition on assumption in bankruptcy." *Catapult,* 165 F.3d at 749. In other words, Section 365(c)(1), by its terms, bars a debtor-in-possession from *assuming* an executory contract without the non-debtor's consent where applicable law precludes *assignment* of such contract to a third party. *Catapult*, 165 F.3d at 749. The debtor is barred regardless whether it actually proposes to assign the executory contract in question. *Catapult*, 165 F.3d at 750.

Furthermore, "[p]olicy arguments cannot displace the plain language of the statute; that the plain language of § 365(c)(1) may be bad policy does not justify a judicial rewrite. And a rewrite is precisely what the actual test requires." *Catapult*, 165 F.3d at 754. Section 365(c)(1) expressly provides that a debtor in possession "may not assume *or* assign" an executory contract where applicable law bars assignment and the non-debtor objects. 11 U.S.C. § 365(c)(1) (emphasis added); *Catapult*, 165 F.3d at 754. "The actual test effectively engrafts a narrow exception onto § 365(c)(1) for debtors in possession, providing that, as to them, the statute only prohibits assumption *and* assignment, as opposed to assumption *or* assignment. *See In re Fastrax,* 129 B.R. [274, 277 (Bankr. M.D. Fla. 1991)] (admitting that, by adopting the actual test, the court reads the word "assume" out of subsection (c) with respect to debtors in possession)." *Catapult*, 165 F.3d at 754.

The fact that the statute uses the word "or" a second time in the phrase "assumption or assignment" in 365(c)(1)(B) is further evidence that the hypothetical test is the appropriate test. "By its terms, subsection (c)(1) addresses two conceptually distinct events: assumption and assignment. The plain language of the provision makes it clear that each of these events is contingent on the non-debtor's separate consent. Consequently, where a non-debtor consents to the *assumption* of an executory contract, subsection (c)(1) will have to be applied a second time

if the debtor in possession wishes to *assign* the contract in question." *Catapult*, 165 F.3d at 752. Accordingly, this Court should follow the majority of the circuit courts and adopt the hypothetical test.

(2) <u>Applicable Law Excuses Performance and Prevents Assumption of the License Agreement</u>

The License Agreement grants to the Debtor a non-exclusive right to use certain of POM's trademarks and copyrights. Because both applicable federal trademark and copyright laws specifically excuse POM from accepting performance from or rendering performance to a party other than the Debtor, the Debtor cannot assume or assign the License Agreement under Section 365(c)(1), the License Agreement must be rejected and the rejection of the License Agreement will constitute a prepetition breach.

(a) Federal Trademark Law

The Lanham Trademark Act (the "Lanham Act") governs the parties' rights with respect to POM's trademarks, and is "applicable law" under Section 365(c)(1) that excuses the non-debtor from accepting performance from or rendering performance to an entity other than the debtor, thereby preventing the assumption of such licenses by the debtor. *In re Wellington Vision, Inc.*, 364 B.R. 129, 135-37 (S.D. Fla. 2007); *In re N.C.P. Marketing Group,* 337 B.R. 230, 237 (D. Nev. 2005), aff'd 2008 U.S. App. LEXIS 11624 (9th Cir. Nev. 2009), cert. denied, 129 S.Ct. 1577 (2009); *In re Travelot Co.*, 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002). The Lanham Act provides protection to POM as the registrant of its trademarks. 15 U.S.C. § 1072. The Lanham Act defines a "trademark" as "any word, name, symbol or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. POM's trademarks plainly fall under this definition.

A trademark gives the owner the right to hold a party that uses the trademark in a manner that is likely to cause confusion liable as an infringer or otherwise liable for civil damages. 15 U.S.C. §§ 1114(1), 1125(a)(1); *see also N.C.P. Marketing Group,* 337 B.R. at 236 ("Trademarks are valuable property rights that allow their owners to protect the good will of their name and products by preventing unwarranted interference and use of their mark by others.").

The owner of a trademark may license the use of the trademark to another party. *See, e.g., In re Travelot Co.*, 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002). Non-exclusive trademark licenses are personal in nature and are not assignable by the licensee without the consent of the licensor, unless the license agreement provides otherwise. *Wellington Vision,* 364 B.R. at 134; *N.C.P. Marketing Group,* 337 B.R. at 236; *Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F. Supp. 212, 218 (S.D.N.Y. 1996); *Travelot*, 286 B.R. at 455. Here, POM granted the Debtor a non-exclusive right to use POM's trademarks. The License Agreement specifically states that:

> [POM] grants to [the Debtor] a limited non-transferable, non-exclusive, royalty-free right and license, without the right to sublicense, to use, but not to register, the trademarks and trade names used with the Covered Games as designated by [POM] (the "Marks"), but only in direct relation to the Covered Games, and subject to [POM's] right to specify the method or manner in which [the Debtor] may utilize the Marks.

*License Agreement*, § 2.5(a). The License Agreement granted the Debtor a license to use trademarks belonging to POM, "and therefore the Lanham Act is the 'applicable law' by which the exception to assumption and assignment is triggered via section 365(c)." *Wellington Vision,* 364 B.R. at 135. Because "applicable law," i.e. trademark law, excuses POM from accepting performance from or rendering performance to an entity other than the Debtor, the Debtor cannot assume the License Agreement pursuant to Section 365(c).

        (b)    Federal Copyright Law

{00770918.DOC;1 }                                      13

08-06049-rk    Doc 72    FILED 03/12/10    ENTERED 03/12/10 16:22:09    Page 13 of 20

Federal copyright law governs the parties' rights with respect to POM's copyrights, and also constitutes "applicable law" under Section 365(c)(1). A copyright is described as an original work of authorship fixed in a tangible medium of expression, including literary work, musical works, dramatic works, pictorial works, motion pictures, sound recordings and the like. 17 U.S.C. § 102(a). A copyright gives the owner the exclusive right to exploit or authorize the exploitation of a copyrighted work. *See* 17 U.S.C. § 106; *In re Patient Education Media, Inc.*, 210 B.R. 237, 239 (Bankr. S.D.N.Y. 1997). Non-exclusive copyright licenses are personal in nature and are not assignable by the licensee without the consent of the licensor, unless the license agreement provides otherwise. *See In re Valley Media, Inc.*, 279 B.R. 105, 135 (Bankr. D. Del. 2002) ("A non-exclusive license of rights by a copyright owner to another party is not assignable by that party without the permission of the copyright holder under federal copyright law since the license represents only a personal and not a property interest in the copyright."); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 311 (Bankr. D. Del. 2001); *Patient Education Media, Inc.*, at 240. Courts have thus consistently held that with respect to non-exclusive copyright licenses, federal copyright law is "applicable law" under Section 365(c) that excuses the non-debtor from accepting performance from or rendering performance to an entity other than the debtor, thereby preventing the assumption of such licenses by the debtor. *See, e.g.*, *Sunterra Corp.*, 361 F.3d at 262 n. 7; *In re Valley Media, Inc.*, 279 B.R. 105, 136 (Bankr. D. Del. 2002); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 311 (Bankr. D. Del. 2001).

Here, the License Agreement granted the Debtor a copyright license for the Software and the Fill System:

> During the Term and subject to the terms and conditions of this Agreement, [POM] hereby grants to [the Debtor] a non-transferable license (i) to distribute and sublicense copies of the Software solely to Operators on the terms provided in the Game Distributor Agreement and (ii) to access the Fill System. Such license shall be exclusive to [the

> Debtor] within the Exclusive Territory subject to the minimum Covered Game Placement and other performance requirements of this Agreement.

*License Agreement*, § 2.5(a); *see SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 *5 (N.D. Cal. Dec. 18, 1991) ("It is well established that computer programs are 'works of authorship' subject to copyright."). On a quick read, this section may appear to grant the Debtor an exclusive license to the Software and Fill System within the "Exclusive Territory" (defined in the License Agreement as the states of Ohio, Massachusetts, Michigan and Hawaii). However, it is clear that the license to use the Software and Fill System is non-exclusive.

Under an exclusive copyright license, a licensee can freely transfer its rights, but the original licensor cannot transfer the same rights to anyone else. *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 311, 318 (Bankr. D. Del. 2001); *In re Patient Education Media, Inc.*, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997). Under the License Agreement, POM has the right to operate Covered Games, through itself or its subsidiary, and utilize and license the Software in the four states that comprise the Exclusive Territory. *License Agreement*, § 2.3(a). Moreover, the Debtor expressly acknowledges in the License Agreement that POM owns all right, title and interest in the Software and the Fill System, further evidencing that the grant of a license in the Software and Fill System was a non-exclusive license. *See License Agreement*, § 2.5(b). Finally, the License Agreement does not restrict POM or Ultra Skill Games, LLC from operating Covered Games in that geographic area. Because "applicable law," i.e. copyright law, excuses POM from accepting performance from or rendering performance to an entity other than the Debtor, the Debtor cannot assume the License Agreement pursuant to Section 365(c).

(3)     POM Does Not Consent to the Assumption of the License Agreement

Pursuant to Section 365(c)(1), the Debtor may still assume the License Agreement despite both trademark and copyright law excusing performance if POM consents to the Debtor's

assumption. *See* 11 U.S.C. § 365(c)(1)(B). POM, however, does not consent to the Debtor's assumption of the License Agreement. Therefore, the Debtor cannot assume the License Agreement under Section 365(c)(1), the License Agreement must be rejected and its rejection will constitute a prepetition default under the License Agreement.

### B. The Debtor's Prepetition Breaches Prevent Enforcement of the License Agreement

In executing the License Agreement, the Debtor agreed to certain performance obligations under the License Agreement, both monetary and non-monetary. The Debtor has, however, breached numerous of its obligations under the License Agreement, including (i) failing to pay POM its share of Revenues, (ii) failing to pay professional fees, (iii) failing to collect and remit to the appropriate governmental authority all applicable sales and use tax, (iv) diverting Revenues from the segregated bank account to make distributions to the Debtor's three principals, and (v) failing to use its best efforts to terminate any preexisting agreements with Operators and replace them with Game Distributor Agreements. These breaches existed as of the Petition Date and have remained uncured. Moreover, the Debtor's rejection of the License Agreement will constitute an additional prepetition breach. As a result, the License Agreement is not enforceable by the Debtor and POM is entitled to summary judgment.

The court in *In re Lucre, Inc.*, 339 B.R. 648, 655 (Bankr. W.D. Mich. 2006), appeal dismissed, 471 F. Supp. 2d 845 (W.D. Mich. 2007), addressed the question of what, if any, section of the Bankruptcy Code empowers a debtor-in-possession to compel a non-debtor party to continue performance under an executory contract notwithstanding the debtor's alleged prepetition breach of that contract. The court found that Section 365 provides the answer: assumption. *Lucre*, 339 B.R. at 657. With one exception, there is nothing in Section 365 that permits the debtor to compel performance from the non-debtor party prior to actually assuming

that contract. *Lucre*, 339 B.R. at 657. The one exception is Section 365(b)(4), pertaining to unexpired leases and incidental performance obligations. 11 U.S.C. § 365(b)(4). "If anything, Section 365(b)(4) proves by exception the rule that a trustee or debtor-in-possession cannot otherwise demand performance from the other party to the contract when the debtor's pre-petition breach under the contract remains uncured. In other words, there is no reason for including Section 365(b)(4) in the Bankruptcy Code, if, as [the debtor] would have it, pre-petition defaults are irrelevant to begin with." *Lucre*, 339 B.R. at 658.

In reaching its conclusion, the court noted how the corollary of the section 541 "neutral transfer" rule[6] is that the debtor-in-possession can have no greater or different rights than the debtor with respect to an executory contract unless the Bankruptcy Code itself provides those rights, and if the Bankruptcy Code is silent, then the debtor-in-possession is subject to the same laws and regulations as those that had constrained the debtor prepetition. *Lucre*, 339 B.R. at 654-55. Finding no provision in the Bankruptcy Code that could compel performance, the court found that the "mere commencement of the bankruptcy case and the attendant imposition of the automatic stay do not by themselves empower a debtor, as debtor-in-possession, to compel from the other party to an executory contract performance the day after the commencement of the bankruptcy case when the debtor had no right to compel that performance the day before." *Lucre*, 339 B.R. at 660.

The same court recently addressed Section 365 and its *Lucre* decision in *In re Sturgis Iron & Metal Co., Inc.*, 420 B.R. 716 (Bankr. W.D. Mich. 2009), commenting that:

---

[6] Section 541(a)(1) is simply a mechanism to transfer to the estate whatever interests the debtor had in property as of the petition date so that those interests may be administered by the trustee or debtor-in-possession. The effect of section 541(a)(1) is neutral in that the newly created estate receives no more or no less under section 541(a)(1) than what the debtor had to transfer. *Lucre*, 339 B.R. at 654.

> a debtor-in-possession can demand the other contracting party's performance whereas the debtor-in-possession, because of Section 365(b), can always refuse performance with the assurance that it can later cure that default and regain what otherwise would have been lost had only the law of contract applied. All that *Lucre* adds is simply this -- that while the debtor-in-possession may be able to continue insisting upon the other contracting party's performance, the neutral transfer rule still leaves the other party with the option to refuse if the estate, as the debtor's successor, is itself in material default under that contract. Or, to put it differently, under applicable non-bankruptcy law, an estate in default can have no greater right to demand performance from the other contracting party than had the debtor unless and until the estate takes advantage of the cure provisions that are provided in conjunction with the contract's assumption under Section 365.

*Sturgis*, 420 B.R. at 723 n.17.

*Lucre* and *Sturgis* confirm that the creation of the bankruptcy estate creates no greater rights than the debtor had prepetition, and as such, a debtor-in-possession cannot compel performance from the other party to an executory contract when the debtor's prepetition breach under the contract justifies non-performance by the non-debtor party, at least until such breaches are cured through assumption. The *Lucre* court also foreshadowed the precise issue in this case and commented that "[a] more interesting question arises when the other party has already withheld performance because of a material breach when the debtor files its Chapter 11 petition. The question then is what authority is there under the Bankruptcy Code for the newly-minted debtor-in-possession to compel the other party to **resume** performance when the other party was justified in withholding that performance only the day before?" *Lucre*, 339 B.R. at 655 n.6 (emphasis in original). The answer to that question, which is precisely the question facing this Court in the instant matter, is that there is nothing in the Bankruptcy Code that gives the Debtor the authority to compel POM to resume performance when it had justifiably withheld performance prepetition.

Under Ohio law, a breach of the terms of a contract discharges the obligations of the parties to the contract if the breach is material. *Software Clearing House v. Intrak, Inc.* (1990), 66 Ohio App.3d 163, 170, 583 N.E.2d 1056; *Kersh v. Montgomery Developmental Ctr.* (1987),

35 Ohio App.3d 61, 62, 519 N.E.2d 665; *Bd. of Commissioners of Clermont County, Ohio v. Village of Batavia* (2001), 2001 WL 185464 *3 (Ohio App. 12 Dist. Feb. 26, 2001). "A breach is material if performance or nonperformance of the disputed term is essential to the purpose of the agreement." *Bd. of Commissioners*, 2001 WL at *3. In determining whether a failure to render performance is material, a court is to consider the following five factors: (i) the extent to which the injured party will be deprived of the expected benefit; (ii) the extent to which the injured party can be adequately compensated for the lost benefit; (iii) the extent to which the breaching party will suffer a forfeiture; (iv) the likelihood that the breaching party will cure its breach under the circumstances; and (v) the extent to which the breaching party has acted with good faith and dealt fairly with the injured party. *Software Clearing House v. Intrak, Inc.* (1990), 66 Ohio App.3d 163, 170-71, 583 N.E.2d 1056; *Kersh v. Montgomery Developmental Ctr.* (1987), 35 Ohio App.3d 61, 62-63, 519 N.E.2d 665; *Bd. Of Commissioners of Clermont County, Ohio v. Village of Batavia* (2001), 2001 WL 185464 *3 (Ohio App. 12 Dist. Feb. 26, 2001).

Applying the five factors to the present case, the most significant circumstance is the extent to which POM was deprived of the benefit it sought. Pursuant to the License Agreement, the Debtor was required, among other things, (i) to pay POM its share of Revenues, (ii) to pay professional fees, (iii) to collect and remit to the appropriate governmental authority all applicable sales and use tax, (iv) to deposit all Revenues in the segregated bank account, and (v) to use its best efforts to terminate any preexisting agreements with Operators and replace them with Game Distributor Agreements. The Debtor breached each of these duties.

Based on the Debtor's prepetition breaches of the License Agreement, POM is excused from performing under the License Agreement, and there is no provision in the Bankruptcy Code that requires otherwise. As such, POM is entitled to summary judgment.

### C. POM is Entitled to Summary Judgment on Counts of Accounting, Turnover and Injunctive Relief

Because the License Agreement is not assumable by the Debtor, and because POM's performance under the License Agreement is excused due to the Debtor's uncured breaches, the Debtor is not entitled to an accounting, the turnover of funds, or injunctive relief as requested in the Complaint. Accordingly, POM is entitled to summary judgment in its favor on those counts.

### V. Conclusion

For all of the foregoing reasons, POM is entitled to summary judgment in its favor on all counts of the Complaint.

WHEREFORE, POM respectfully requests that the Court enter an order granting it summary judgment on all counts of the Complaint, and ordering such further relief as is just and proper.

Dated: March 12, 2010

Respectfully submitted,

| | |
|---|---|
| JEFFREY L. TARKENTON | /s/ Ronald M. McMillan |
| (admitted *pro hac vice*) | JEAN R. ROBERTSON (0069252) |
| LOUIS J. ROULEAU | MARK I. WALLACH (0010948) |
| (admitted *pro hac vice*) | RONALD M. MCMILLAN (0072437) |
| TODD D. ROSS | CALFEE, HALTER & GRISWOLD LLP |
| (admitted *pro hac vice*) | 1400 KeyBank Center |
| WOMBLE CARLYLE SANDRIDGE & RICE, PLLC | 800 Superior Avenue |
| 1401 Eye Street, N.W., 7th Floor | Cleveland, Ohio 44114 |
| Washington, D.C. 20005 | Telephone: (216) 622-8200 |
| Telephone: (202) 857-4450 | Facsimile: (216) 241-0816 |
| Facsimile: (202) 261-0050 | jrobertson@calfee.com |
| | mwallach@calfee.com |
| | rmcmillan@calfee.com |
| Co-Counsel for Defendant Pace-O-Matic, Inc. | |
| | Co-Counsel for Defendant Pace-O-Matic, Inc. |