# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>OHIO SKILL GAMES INCORPORATED,<br><br>                Debtor. | In Proceedings Under Chapter 11<br><br>CASE NO. 08-60560<br><br>JUDGE RUSS KENDIG |
| OHIO SKILL GAMES INCORPORATED,<br><br>                Plaintiff,<br><br>    v.<br><br>PACE-O-MATIC, INC.,<br><br>                Defendant. | ADV. NO. 08-6049<br><br><br><br>**MEMORANDUM OF LAW IN OPPOSITION TO OHIO SKILL GAMES INCORPORATED'S MOTION FOR SUMMARY JUDGMENT** |

       Pace-O-Matic, Inc. ("POM"), by and through its undersigned counsel, hereby submits this Memorandum of Law in Opposition to Ohio Skill Games Incorporated's Motion for Summary Judgment (the "Motion") and states as follows:

## I.    Introduction

       In the Motion, Ohio Skill Games Incorporated ("Debtor" or "OSG"), the plaintiff in this adversary proceeding and the debtor in the above-captioned bankruptcy case, alleges that it is entitled to summary judgment on counts one and three of its Amended Complaint. First, it asserts that there are no issues of material fact regarding whether it is appropriate for this Court to declare that the Amended and Restated Master Software License and Distribution Agreement (the "License Agreement") is in effect, that the rights between the parties are controlled by the agreement, that the defaults which existed as of the time of the filing of the petition can be cured, and that POM's entitlement to adequate assurance of future performance can be satisfied.

Second, the Debtor asserts that there are no issues of material fact on the issue of whether POM is in possession of cash that is property of the estate and thus subject to turnover.

As discussed more fully below, the non-assumable nature of the License Agreement pursuant to Section 365(c)[1] precludes the grant of summary judgment in the Debtor's favor and requires the grant of summary judgment to POM. Furthermore, rather than support the "facts" that OSG alleges, the evidence given in the depositions rebuts those "facts" thereby also precluding summary judgment. Accordingly, even if the License Agreement were assumable, the Debtor could not cure the defaults under the License Agreement or provide POM with adequate assurance of future performance. Therefore, the Motion must be denied in its entirety.

## II. Argument

### A. Summary Judgment Standards

Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 govern motions for summary judgment in adversary proceedings in the United States Bankruptcy Courts. In pertinent part, Rule 56(c) provides that:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); s*ee also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986); *Davison v. Roadway Exp., Inc.,* 2008 WL 2522340, at *3 (N.D. Ohio June 26, 2008).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist and that judgment should be granted in its favor as a matter of law. *Celotex,*

---

[1] All references to statutory sections are to Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended and applicable herein, the "Bankruptcy Code"), unless otherwise noted.

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 2 of 20

477 U.S. at 322-23; *Davison,* 2008 WL 2522340, at *3. The movant must inform the Court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-23. There is no genuine issue for trial only if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 585-87; *Liberty Lobby, Inc.,* 477 U.S. at 249-50.

For the reasons discussed herein, judgment should be granted in favor of POM (not OSG) as a matter of law.

**B.    The License Agreement is Not Assumable Pursuant to Section 365(c)**

On March 12, 2010, POM filed Pace-O-Matic, Inc.'s Second Motion for Summary Judgment and an accompanying Memorandum of Law in support thereof (collectively, "POM's Motion"). POM's Motion is incorporated by reference as if fully set forth herein.

As discussed in POM's Motion, because applicable federal trademark and federal copyright law prohibit the Debtor from assigning the License Agreement without POM's consent, Section 365(c) bars the Debtor from assuming the License Agreement and the License Agreement must be rejected. The rejection of the License Agreement constitutes a breach that precludes the Debtor from enforcing its rights under the License Agreement. In addition, prepetition, the Debtor defaulted on both monetary and non-monetary performance obligations under the License Agreement which independently preclude the Debtor from enforcing any rights under the License Agreement.

Unable to assume the License Agreement, the Debtor cannot prevail on its Motion as it has no ability to cure defaults, no ability to enforce the License Agreement, and no ability to provide adequate assurance of future performance. Therefore, summary judgment for the Debtor must be denied.

3

### C. OSG Fails to Establish That It Is Entitled to Judgment as a Matter of Law

1. *There is No Dispute that OSG Defaulted on its Contractual Obligations*

As stated above, OSG bears the initial burden of demonstrating that no genuine issues of material fact exist and that judgment should be granted in its favor as a matter of law. To do so, OSG must inform the Court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Here, rather than demonstrate that no genuine issues of material fact exist, OSG simply restates its unsupported factual contentions.

OSG admits in the Motion that it has not fulfilled its obligations as set forth in the License Agreement. (Motion at p. 10 ("Debtor has the ability to cure the meritorious defaults listed in the prepetition communications from Pace.")) Indeed, there can be no legitimate dispute that following the raid of OSG's offices and the enactment of Ohio House Bill 177 in late October 2007, OSG stopped performing substantially all of its duties under the License Agreement. Instead, it now contends that, following the raid, OSG and POM orally modified the License Agreement to excuse OSG from performing its duties and that, to the extent that it defaulted, it can now cure those defaults. The exact terms of the oral modification to the contract change each time OSG tells its story, and tellingly, OSG failed to allege the existence of the oral modification in either the Complaint or the Amended Complaint. Now, however, OSG contends that it is entitled to payment under an orally modified contract for services that it did not perform and that OSG ought to be permitted to cure defaults and assume that orally modified contract.

Glaringly absent from the affidavits that OSG attaches to the Motion are any sworn statements setting forth the alleged oral agreement which forms the basis for the Debtor's entire argument. Thus, the Debtor facially fails to carry its burden for summary judgment as it fails to demonstrate not only the absence of a genuine issue, but that its alleged facts even exist.

4

2. *OSG's Principal Officer Did Not Stay with the Business, and Those Remaining Cannot Run It*

(a) Jay Young

POM and OSG engaged in discussions following the October raids and the enactment of H.B. 177 in an effort to identify a basis on which they could continue to do business together. Those efforts failed once Jay Young, OSG's president and the person who ran OSG's business, quit the business, resigned his office and transferred his stock back to OSG.

The discussions regarding modifying the License Agreement in order for POM and OSG to continue to do business with each other were contingent on Mr. Young's continuing to work for OSG. (Declaration of Michael R. Pace in Support of the Memorandum of Law in Opposition to Ohio Skill Games Incorporated's Motion for Summary Judgment (the "Pace Declaration") ¶ 21). A true and correct copy of the Pace Declaration is attached hereto as <u>Exhibit A</u>. Those discussions fell apart when Jay Young resigned and left the employ of OSG. POM recognized that Mr. Young was the workhorse who led all aspects of OSG's business and, most importantly, handled virtually all of the Debtor's sales of Covered Games and Refills, and his continued involvement was critical to OSG's successful operations and its performance of its obligations under the License Agreement. (Pace Declaration ¶ 17.)

Prior to late December, 2007, Mr. Young, Mildred Kowell and Jan Anasis each owned one-third of the stock in OSG. While Mrs. Kowell and Ms. Anasis had limited involvement in the operations of OSG, Mr. Young was clearly in charge. As Mr. Young testified at his deposition:

> Q. What do you mean you mainly ran the company?
>
> A. I mainly ran the company.

5

> Q. They had minimal involvement?
>
> A. I would say that's fair.

Young Dep. Tr. at p. 15, lines 22-25, an excerpt of which is attached hereto as <u>Exhibit B</u>.

Mr. Young testified that he handled " . . . the sales, lawsuits, customer complaints, location protection" and that he spent "7,000 minutes a month talking to customers." Young Dep. Tr. at p. 16, lines 7-8, 14, an excerpt of which is attached hereto as <u>Exhibit B</u>. He further testified that he "did everything." Young Dep. Tr. at p. 16, lines 18-19, an excerpt of which is attached hereto as <u>Exhibit B</u>. Although Mr. Young did "practically everything" and effectively ran the business, OSG still required four employees to handle sales of fills, technical support, financials and deliveries of product. Young Dep. Tr. at p. 19, line 3 - p. 21, line 4, an excerpt of which is attached hereto as <u>Exhibit B</u>. OSG had at least one employee on duty 24 hours each day to handle fills. Young Dep. Tr. at p. 20, line 4, an excerpt of which is attached hereto as <u>Exhibit B</u>.

Everyone recognized that Mr. Young was necessary to the successful operation of OSG's business.

       (b)    Grant Kowell

Mr. Kowell, however, was not a principal, he was not an owner, he was not one of OSG's employees and he had a limited role in OSG's operations. Mr. Young testified:

> Q. How about George Anasis, did he have any role in the operation of the company?
>
> A. No.
>
> Q. How about Mr. Kowell?
>
> A. No, besides being my friends.
>
> Q. So Mr. Kowell didn't have any responsibility for operating the company?

6

> A. He gave me a lot of advice, because obviously, he was concerned about his wife making money. . . .

Young Dep. Tr. at p. 21, lines 6 -14, an excerpt of which is attached hereto as Exhibit B.

Mr. Kowell does not hold an ownership interest in OSG, and he has never been an officer or employee of OSG. His involvement in the business was limited, as Mr. Young testified, to providing Mr. Young with advice. Mrs. Kowell's deposition testimony was consistent with Mr. Young's testimony on this point as was a letter that she wrote to Michael Pace dated February 24, 2008 (the "Kowell Letter").[2] A true and correct copy of the Kowell Letter is attached hereto as Exhibit D. In the letter, she stated that Mr. Kowell's involvement in OSG's business had been limited to providing Mr. Young with advice. She wrote:

> My husband, Grant "Fuzzy" Kowell may represent me as my agent regarding OSG in meetings. He has also been retained by OSG to further promote sales and customer relations, which he has always done. <u>Previously, he accomplished these items through guiding and directing Jay Young.</u>

Kowell Letter at p. 1 (emphasis added).

(c) Mildred Kowell

Mrs. Kowell, who, prior to January 2010, held a one-third interest in OSG and who now owns all of the stock in OSG and serves as its president and sole employee, has never been involved in the operation of OSG's business. Mrs. Kowell testified that, other than receiving her $6,000 per month salary, she was not involved in the operating or running of OSG and she performed no services for OSG. Ms. Kowell Dep. Tr. at p. 12, line 22 to p. 13, line 8, an excerpt of which is attached hereto as Exhibit C. She did not attend board meetings. Ms. Kowell Dep. Tr. at p. 18, lines 17-23, an excerpt of which is attached hereto as Exhibit C. She never visited

---

[2] Although Mrs. Kowell signed the letter, she testified that her husband actually wrote the letter. Ms. Kowell Dep. Tr. at p. 53, lines 4-12, an excerpt of which is attached hereto as Exhibit C.

OSG's offices and didn't even know where they were located. Ms. Kowell Dep. Tr. at p. 25, lines 8-16, an excerpt of which is attached hereto as Exhibit C.

Mrs. Kowell said that the ownership interests in OSG were put in her name, rather than in Mr. Kowell's name, because Mr. Kowell was concerned that his earlier arson conviction could impact the ability to get games licensed. She testified:

> Q. Why did Fuzzy transfer his ownership interest to you?
>
> A. I believe at one time he was interested in having the machines licensed within the State of Ohio, and he was concerned that with his former felony, that that would be a problem.
>
> So he decided that it would be better that I have that particular share in the ownership.
>
> Q. The concern was that a part owner of the business with a felony could impact the ability to get the machines licensed?
>
> A. Correct, and he wanted to have them licensed.
>
> Q. What felony had Mr. Kowell been convicted of?
>
> A. Arson.
>
> Q. When was that?
>
> A. 1989, 87, late 1980s.
>
> Q. And what, do you know what court he was convicted in?
>
> A. I believe it was Cleveland Federal.

Ms. Kowell Dep. Tr. at p. 13, line 20 to p. 14, line 17, an excerpt of which is attached hereto as Exhibit C.

      3. *OSG and POM Discussed Continuing to Conduct Business Together But Did Not Reach Any Agreement*

On September 19, 2007, Michael R. Pace, President of POM, met with Grant "Fuzzy" Kowell at his arcade in Perry, Ohio, where Mr. Kowell informed Mr. Pace that he had worked out a game design with a sub-distributor in Michigan, Andrew Dahl, who would buy over 5,000

8

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 8 of 20

games if POM would design and program a game concept called Plot the Spot. (Pace Declaration ¶ 13.) Based on Mr. Kowell's representation, POM embarked on developing the Plot the Spot game and incurred over $200,000 in costs to support the effort. (Pace Declaration ¶ 14.) Once the game was completed, POM showed the game to Mr. Kowell, who approved it. (Pace Declaration ¶ 14.)

Following the raids and the enactment of HB 177, OSG immediately ceased performing its contractual duties in Ohio, it ceased purchasing Covered Games from POM for use in Ohio and it ceased selling Refills and collecting the related fees. (Pace Declaration ¶ 10.) Although as of October 25, 2007 OSG was already in default on certain contractual obligations, following that date it defaulted on substantially all of its remaining obligations. Prior to October 25, 2007, OSG had defaulted by failing, among other things, to pay outstanding invoices when due. (Pace Declaration ¶ 11.) Following October 25, 2007, OSG defaulted by generally failing to perform any of its obligations under the License Agreement. (Pace Declaration ¶ 12.)

In late November 2007, Mr. Young asked Mr. Pace to meet with him in Ohio to discuss payment of the sums owed by the Debtor to POM. (Pace Declaration ¶ 15.) Ron Carrara, POM's Vice President of Sales, Bob Hawk, POM's Vice President of Compliance, and Mr. Pace flew to Ohio where, on November 28, 2007, they met with Mr. Young, Mr. Kowell and Kurt Gearhiser. Mr. Young was not only the president of OSG but he had been POM's principal point of contact with the Debtor throughout the period of time that POM and the Debtor conducted business together. (Pace Declaration ¶ 16.) Mr. Gearhiser was the Debtor's counsel. As noted above, Mr. Kowell was the husband of Mildred Kowell who, at the time of the meeting, owned a one-third interest in the Debtor.

At the November 28, 2007 meeting, Mr. Young disclosed that the Debtor had no funds to pay its obligations to POM or to its attorneys, and that it lacked the resources and ability to continue to perform its obligations pursuant to the License Agreement to provide service to operators in Ohio. (Pace Declaration ¶ 18.) Mr. Pace was surprised by the statement that the Debtor lacked the funds needed to pay the obligations, since Mr. Pace was aware that the Debtor had retained approximately two million dollars from sales of Covered Games and Refills during calendar year 2007.[3] (Pace Declaration ¶ 18.)

During the course of the November 28, 2007 meeting, the Debtor proposed, in light of the enactment of H.B. 177 and its inability to perform its contractual obligations, that POM develop a new game that complied with the new Ohio law, that POM handle all sales of and support for the new game, and that POM use sales proceeds (a) to pay POM's 50% share of the revenues from the sale of the games, (b) to pay POM's expenses incurred in connection with the development, sales and support of the new game, (c) to pay the Debtor's arrearages to POM, and (d) to pay the Debtor's past due obligations to attorneys. (Pace Declaration ¶ 19.) The Debtor said that it would undertake efforts to rebuild its business in order to be in a position to perform its duties under the License Agreement in the near future. (Pace Declaration ¶ 19.) Finally, it proposed that after the obligations had been paid, then POM and the Debtor would regroup to discuss whether and what type of business the parties could do together in the future. (Pace Declaration ¶ 19.)

Mr. Young's recollection of the discussions during the November 28, 2007, meeting as recounted in his deposition are similar to Mr. Pace's recollection. Mr. Young testified:

---

[3] Discovery has revealed that OSG made distributions of $562,000 to each of its three shareholders during the twelve-month period preceding the Petition Date. *See* Exhibit E attached to the Memorandum of Law in support of Pace-O-Matic, Inc.'s Second Motion for Summary Judgment (Docket No. 72).

> Q. And back to that meeting that you had with Mr. Pace, so let me see if I've got this straight. So your recollection of the agreement was that Pace-O-Matic would handle fills in Ohio until Poovey got paid?
>
> A. And he got paid.
>
> Q. And Pace got paid what he was owed?
>
> A. And we also discussed -- sorry.
>
> Q. And then after that you all would --
>
> A. <u>Reevaluate</u>.
>
> Q. -- reevaluate and decide what to do to go forward. And was there any other aspect to this agreement, or was that it?
>
> A. We agreed that Meeks and Kurt needed paid, too. That was discussed. I don't even remember exactly how we were going to do that. I just know that Poovey and what Mike was owed was coming first. Do you see what I'm saying?
>
> Q. Right. And then as far as whether Gearhiser and Meeks would get paid next or whether that was going to be reevaluated later --
>
> A. They were going to be paid.
>
> Q. They were.

Young Dep. Tr. at p. 72, lines 1-23 (emphasis added) , an excerpt of which is attached hereto as <u>Exhibit B</u>.

At the time of the November 28, 2007 meeting, Mr. Pace was aware that, following the raid, Mr. Young had moved his family out of the State of Ohio, and Mr. Pace was concerned about OSG's ability to rebuild its business unless Mr. Young was physically present in Ohio. (Pace Declaration ¶ 20.) During the meeting, Mr. Pace stated that Mr. Young's continued sales work was critical if POM and the Debtor were going to continue to conduct future business together. (Pace Declaration ¶ 21.) POM was assured that Mr. Young would continue to serve as the president of the Debtor and would be responsible for sales. (Pace Declaration ¶ 21.) Mr. Young testified that when the parties met in November 2007, he did not tell Mr. Pace that he was

11

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 11 of 20

planning to quit. Young Dep. Tr. at p. 74, lines 11-19, an excerpt of which is attached hereto as <u>Exhibit B</u>.

Following the November 28, 2007 meeting, POM developed new software for the Covered Games that could legally be played in Ohio and Mr. Pace demonstrated the game to OSG at a meeting held in Ohio on or about December 12, 2007. (Pace Declaration ¶ 23.)

At the December 12, 2007 meeting, the parties had additional discussions about continuing to conduct business together. During that meeting, Mr. Kowell said that proceeds from the sale of the new game should not be used to pay for outstanding professional fees, as had been discussed at the November 28, 2007 meeting. (Pace Declaration ¶ 24.) Following the December 12, 2007 meeting, Mr. Pace had several telephone calls with Mr. Kowell during which Mr. Kowell reiterated that the proceeds should not be used to pay outstanding professional fees and during which Mr. Kowell said that he wanted OSG to discontinue paying for services being rendered by Bob Hawk. (Pace Declaration ¶ 24.) Mr. Pace responded on each occasion that the payment of professional fees and Mr. Hawk's fees were a prerequisite to continuing to conduct business together. (Pace Declaration ¶ 24.)

Mr. Pace's final telephone conversations with Mr. Kowell were held on December 28, 2007, at which time Mr. Kowell told Mr. Pace that he was going to "take a free ride," which Mr. Pace understood to mean that he wanted POM to handle all future sales and support for the Covered Games and Refills, that OSG would have no further operational duties in Ohio and that POM would continue to pay the Debtor a percentage of the revenues. (Pace Declaration ¶ 25.) Mr. Kowell threatened Mr. Pace during this telephone call and said that he would have somebody "whack" Mr. Pace. (Pace Declaration ¶ 25.)

12

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 12 of 20

On January 15, 2008, Mr. Pace spoke with Andrew Dahl, the Michigan sub-distributor, and learned that Mr. Dahl had not worked with Mr. Kowell on the Plot the Spot game concept as had been represented by Mr. Kowell, and in fact did not like the game and would not buy it. (Pace Declaration ¶ 26.) Mr. Kowell's misrepresentations caused POM to incur over $200,000 in costs and expenses for a game that would not sell. (Pace Declaration ¶ 14.)

On or about January 17, 2008, Mr. Kowell telephoned Mr. Carrara and told Mr. Carrara that his wife, Mildred Kowell, had taken control of all of the stock in the Debtor, and that Mr. Young had quit working for the Debtor. (Declaration of Ron Carrara in Support of the Memorandum of Law in Opposition to Ohio Skill Games Incorporated's Motion for Summary Judgment (the "Carrara Declaration") ¶ 8.) A true and correct copy of the Carrara Declaration is attached hereto as Exhibit E. He also told Mr. Carrara that they had moved OSG's office to the Kowells' basement and that they intended to operate OSG from that location. (Carrara Declaration ¶ 9.)

Mrs. Kowell's testimony confirms that OSG abandoned its office and warehouse space and that the Kowells intended to operate the business from their basement. Mrs. Kowell Dep. Tr. at p. 27, lines 23-24; p. 29 at lines, 10-11, an excerpt of which is attached hereto as Exhibit C.

After this series of events, POM issued the two termination notices which are attached to the Pace Declaration as Exhibits A and B.

Although the Debtor proposed modifications to the License Agreement that could have enabled the parties to continue to conduct business together for at least a limited amount of time, OSG continued to change its proposed terms, and no modification was ever implemented or agreed to by POM. Moreover, the discussions regarding continuing to conduct business together

13

were justifiably conditioned on Mr. Young continuing to serve as OSG's president and to perform the role that he had performed prior to the October raids and the enactment of H.B. 177.

### 4. *The License Agreement Was Never Modified*

At no time before, during, or following the November 28, 2007 meeting did anyone on behalf of OSG ask to modify or change the terms of the License Agreement or OSG's duties pursuant to the License Agreement. (Pace Declaration ¶ 22.) Furthermore, Section 7.3 of the License Agreement provides in pertinent part the following: "No amendment or modification of this Agreement, including this Section 7.3, shall be valid unless *made in writing and signed by the parties hereto.* No term or condition of this Agreement shall be deemed to have been waived except by written instrument of the party charged with such waiver." License Agreement § 7.3 (emphasis added). The parties have not modified or amended the License Agreement, the affidavits do not support the contention that the parties amended the License Agreement and, in any event, the Court should disregard this claim because any alleged oral amendment or modification is unenforceable.[4] License Agreement § 7.3.

### 5. *The Debtor Repeatedly Defaulted*

In the Motion, the Debtor admits that it has defaulted under various provisions of the License Agreement and it proposes a means for their cure. However, the Debtor fails to address many of its defaults under the License Agreement, which include:

- The Debtor failed to use commercially reasonable efforts to actively increase the placement of Covered Games and the revenue derived from servicing those games.
- The Debtor failed to adequately maintain an inventory of spare parts.

---

[4] "Absent evidence of waiver, however, Ohio courts generally enforce contractual requirements that modifications to the contract be made in writing." *Star Leasing Co. v. G&S Metal Consultants, Inc.*, 2009 WL 714146 *7 (Ohio App. 10th Dist. March 19, 2009). To establish a waiver, there must be "clear and convincing" evidence that the parties knowingly modified the contract. *Id.* Here, the affidavits do not even allege that the parties agreed to a modification.

14

WCSR 4339687v4

- The Debtor failed to maintain a telephone number, fax, or email staffed for customers to contact to obtain service.
- The Debtor failed to collect and remit to the appropriate governmental authority all applicable sales and use tax.
- The Debtor failed to provide POM with a copy of each Game Distributor Agreement.
- The Debtor failed to immediately deposit all revenues into a segregated account.
- The Debtor failed to deposit 10% of its share of revenues into a segregated escrow account used for payments to third parties related to ensuring compliance with applicable laws.
- The Debtor converted POM's property by misappropriating the 10% share of the revenues that was to be used for payments to third parties related to ensuring compliance with applicable laws.
- The Debtor failed to pay POM amounts due and owing within seven days.
- The Debtor failed to use its best efforts to terminate any preexisting agreements with operators and replace them with Game Distributor Agreements.
- The Debtor failed to obtain and provide to POM legal opinions regarding the lawfulness of the sale and operation of Covered Games in Massachusetts, Michigan, and Hawaii.
- The Debtor purchased equity interests held by Mr. Young and Mr. Anasis in the Debtor.
- The Debtor generally failed to perform any if its obligations under the License Agreement after October 25, 2007.

OSG admits in its Motion that many of these defaults are existing, and it completely fails to address several of the other defaults. The following defaults are either conceded in the Motion by OSG or were admitted to in the depositions:

a.  Escrow Account. Pursuant to Section 4.2 of the License Agreement, an escrow account was to be established and funded in order to pay for compliance testing, legal fees, and other third party costs. The Debtor failed to establish the escrow account (Young Dep. Tr. at p. 48, lines 11-14, an excerpt of which is attached hereto as <u>Exhibit B</u>), and failed to set aside a percentage of its revenues for its contribution to legal fees. As a result, the Debtor is past due on its legal bills. *See* Schedule F.

15

b. **Unpaid Invoices.** Pursuant to Section 4.2 of the License Agreement, the Debtor was required to pay POM its share of the revenues within seven days of the invoice date. The Debtor acknowledges that it is in default of this provision. (Motion pp. 12-13.)

c. **Unpaid Taxes.** Pursuant to Section 4.1(b), the Debtor was required to collect and remit to the appropriate governmental authorities all applicable sales and use tax on the Refill sales. According to Schedule E and as evidenced by the proofs of claim filed by the State of Ohio, the Debtor has defaulted on this provision. Attached hereto as <u>Exhibit F</u> are true and correct copies of the proofs of claim filed by the State of Ohio.

d. **Failure to Staff.** The Debtor has no employees and, to the extent that the Debtor is even conducting business, it conducts that business out of the Kowells' basement. Ms. Kowell Dep. Tr. at p. 27, lines 23-24; p. 29 at lines 10-11, an excerpt of which is attached hereto as <u>Exhibit C</u>. When the Debtor was operating, Mr. Young ran the business with the help of four employees to handle sales of fills, technical support, financials and deliveries of product. Young Dep. Tr. at p. 19, line 3 to p. 21, line 4, an excerpt of which is attached hereto as <u>Exhibit B</u>. The Debtor had at least one employee on duty 24 hours each day to handle fills. Young Dep. Tr. at p. 20, line 4, an excerpt of which is attached hereto as <u>Exhibit B</u>. The Kowells have no experience running the business.

f. **Failure to Execute New Game Distributor Agreements.** The Debtor failed to terminate old agreements and execute new Game Distributor Agreements as required by paragraph 7.3 of the License Agreement. Mr. Kowell Tr. at p. 58, line 25 to p. 59, line 2, an excerpt of which is attached hereto as <u>Exhibit G</u>.

D. **The Debtor Cannot Cure the Defaults**

The expiration or non-expiration of the cure period under the License Agreement is irrelevant because the Debtor cannot assume the License Agreement. First, the License

16

WCSR 4339687v4

08-06049-rk  Doc 74  FILED 03/31/10  ENTERED 03/31/10 16:50:42  Page 16 of 20

Agreement is not assumable under Section 365(c), rendering the Debtor's ability or non-ability to cure moot. Second, even if the Debtor were not precluded from assuming the License Agreement pursuant to Section 365(c), it is not capable of curing the defaults and providing adequate assurance of future performance.

Accordingly, the Debtor has failed to meet its burden on summary judgment.

### E. The Debtor is Unable to Provide Adequate Assurance of Future Performance

Even if the License Agreement were assumable, which it is not, OSG cannot demonstrate that it is capable of providing adequate assurance of future performance. Indeed, based on the current ownership and management of the Debtor, the Debtor cannot provide *any* assurance of future performance, let alone *adequate* assurance. The Debtor proposes no solution relating to how it will structure its operations, employ the necessary people, acquire the necessary equipment, replace old Game Distributor Agreements with new ones, etc. — in essence, how it intends to operate its business on a daily basis. The President and sole owner of the Debtor, Mrs. Kowell, testified that she doesn't know anything about the daily operations of the Debtor. Mrs. Kowell testified that, other than receiving her $6,000 per month salary, she was not involved in the operating or running of the Debtor and she performed no services for the Debtor. Ms. Kowell Dep. Tr. at p. 12, line 22 to p. 13, line 8, an excerpt of which is attached hereto as Exhibit C. She did not attend board meetings. Ms. Kowell Dep. Tr. at p. 18, lines 17-23, an excerpt of which is attached hereto as Exhibit C.

Mr. Kowell had the limited role of giving Mr. Young advice, but he was not involved in the day to day operations of the business. Moreover, when vesting the stock ownership in Mrs. Kowell, both Mr. and Mrs. Kowell recognized that, due to his felony conviction, Mr. Kowell's involvement with OSG could undermine OSG's business.

17

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 17 of 20

More importantly, OSG is simply not operating. When OSG was conducting business and performing its duties under the License Agreement, it operated from offices, it stored product in a warehouse, it had employees and it had a delivery truck. Young Dep. Tr. at p. 22 line 8 to page 23, line 11, an excerpt of which is attached hereto as <u>Exhibit B</u>. Now, OSG does not have the offices, employees, warehouse space and delivery vehicles needed to operate its business.

Lastly, POM has an excellent reputation in the gaming industry, a reputation that is critical to POM's continued success. (Pace Declaration ¶ 30.) To the extent that Mr. Kowell is involved in the operations of OSG, his felony conviction, threats of physical violence and misrepresentations do not coincide with POM's values and reputation, and would likely harm POM's business. (Pace Declaration ¶ 31.) Any business relationship between POM and the Debtor where Mr. Kowell is a "key man" is simply impossible.

In short, the current ownership and management of the Debtor do not have the experience or knowledge to provide adequate assurance of future performance. Furthermore, the Debtor is not able to rely on past revenues collected by POM as adequate assurance. Without any assurances of future performance, the Debtor fails to satisfy Section 365(b)(1)(C). The Debtor has no factual or legal basis that would permit this Court to award the Debtor any relief under the License Agreement; rather, the License Agreement must be deemed rejected. The Debtor has failed to satisfy its burden under Rule 56, so the Court should deny its Motion. POM, by contrast, has amply demonstrated that there is no genuine issue of material fact with respect to POM's Motion. POM, not OSG, is entitled to judgment in its favor as a matter of law.

18

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 18 of 20

### III. Conclusion

OSG is nothing more than a shell corporation operating in its sole employee's basement. Even if it had any legal basis to enforce any of the provisions of the License Agreement, it would be substantially inequitable for this Court to do so. OSG, however, has no basis to enforce the License Agreement, and its request that the Court do so should be denied. For these and the foregoing reasons, therefore, POM respectfully requests that the Court enter an order denying summary judgment to the Debtor on counts one and three of the Complaint, that the Court grant POM's Motion, and that the Court order such further relief as is just and proper.

Dated: March 31, 2010                                              Respectfully submitted,

| | |
|---|---|
| JEFFREY L. TARKENTON<br>(admitted *pro hac vice*)<br>TODD D. ROSS<br>(admitted *pro hac vice*)<br>WOMBLE CARLYLE SANDRIDGE & RICE, PLLC<br>1401 Eye Street, N.W., 7th Floor<br>Washington, D.C. 20005<br>Telephone: (202) 857-4450<br>Facsimile: (202) 261-0050<br><br>Co-Counsel for Defendant Pace-O-Matic, Inc. | /s/ Ronald M. McMillan<br>JEAN R. ROBERTSON (0069252)<br>MARK I. WALLACH (0010948)<br>RONALD M. MCMILLAN (0072437)<br>CALFEE, HALTER & GRISWOLD LLP<br>1400 KeyBank Center<br>800 Superior Avenue<br>Cleveland, Ohio 44114<br>Telephone: (216) 622-8200<br>Facsimile: (216) 241-0816<br>jrobertson@calfee.com<br>mwallach@calfee.com<br>rmcmillan@calfee.com<br><br>Co-Counsel for Defendant Pace-O-Matic, Inc. |

WCSR 4339687v4

08-06049-rk    Doc 74    FILED 03/31/10    ENTERED 03/31/10 16:50:42    Page 19 of 20

## CERTIFICATE OF SERVICE

I, Ronald M. McMillan, hereby certify that Pace-O-Matic, Inc.'s Memorandum of Law in Opposition of Ohio Skill Games Incorporated's Motion for Summary Judgment was electronically transmitted on or about March 31, 2010 via the Court's CM/ECF system to the following parties who are listed on the Court's Electronic Mail Notices List:

- Ronald M. McMillan    rmcmillan@calfee.com, mmcgarry@calfee.com
- Michael J Moran    moranecf@yahoo.com
- Jean R. Robertson    jrobertson@calfee.com
- United States Trustee    (Registered address)@usdoj.gov

Dated: March 31, 2010                                         /s/ Ronald M. McMillan
                                                              Ronald M. McMillan

{00770911.DOC;1 }