The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.



/S/ RUSS KENDIG

Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| OHIO SKILL GAMES INC., | ) | CASE NO. 08-60560 |
| | ) | |
| Debtor. | ) | ADV. NO. 08-6049 |
| | ) | |
| OHIO SKILL GAMES INC., | ) | JUDGE RUSS KENDIG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| PACE-O-MATIC, INC., | ) | **(NOT INTENDED FOR** |
| | ) | **PUBLICATION)** |
| Defendant. | ) | |
| | ) | |

    The parties filed cross-motions for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056. Plaintiff-debtor, Ohio Skill Games Incorporated (hereafter "Debtor"), seeks summary judgment on counts one and three of its complaint, while Defendant Pace-O-Matic, Inc. (hereafter "Defendant") seeks summary judgment on a count for declaratory judgment. The parties filed responses opposing one another's motions. The issues between the parties center on the status of a prepetition business contract between the parties.

    The court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding

under 28 U.S.C. 157(b)(2). The following constitutes the court's findings of facts and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

## FACTUAL BACKGROUND

Debtor and Defendant were parties to an Amended and Restated Master Software License and Distribution Agreement dated April 29, 2007 (hereafter "Agreement"). The Agreement was signed by Michael Pace (hereafter "Pace"), Defendant's President and Chief Executive Officer, and Jay Young, Debtor's President. The Agreement amended a previous contract between the parties dating to 2004. At the time the Agreement was executed, Debtor was owned by three individuals: Jay Young, Jan Anasis and Mildred Kowell.

Defendant, designated as "Manufacturer" in the Agreement, designs and develops what it refers to as "skill-based amusement games." Debtor contracted to distribute the games as set forth in the Agreement (and is referred to as "Distributor" in the Agreement). The games utilize proprietary software, also designed and developed by Defendant. The Agreement contained clauses relating to Defendant's intellectual property, including section 2.5 captioned "License." At one point in the parties' relationship, Debtor had placed 3,500 games in Ohio, the peak of Debtor's distributorship under the Agreement.

The legality of the games that are the subject of the Agreement permeated the parties' relationship. (More detail on the legal challenges can be found in the Court's opinion dated April 21, 2009.) On October 25, 2007, laws governing the games were amended to remove the games from the definition of "skill-based amusement machine" under Ohio law. As a result, the games were no longer "skill" games, but games of chance, and therefore illegal.

At some point prior to October 2007, the State of Ohio seized the assets of Debtor, rendering performance of obligations under the Agreement impossible and Debtor effectively ceased operating. Most of the necessary duties, including collection of accounts, was temporarily shifted to Defendant, with Debtor's knowledge and consent.

The parties met subsequently, had discussions on their future business involvement, including how to alter the games to make them legal skill games, but never reached a formal consensus on the parties' future relationship. The parties' dealings are complicated by Debtor's loss of a key employee, Jay Young, and Defendant's opposition to Grant Kowell stepping in the shoes of Mr. Young.

Although Debtor's assets were returned at some point at 2008, the parties'

business relationship substantially deteriorated through this period, culminating in the issuance of a letter from Pace, in early February 2008, attempting to terminate the Agreement. As grounds, he cited the assignment of ownership interest from Mildred Kowell to her husband, Grant "Fuzzy" Kowell, as well as the lack of performance of "distribution functions" under the Agreement. Responsive correspondence on behalf of Debtor and/or its principals was issued on February 11, 2008. In turn, Defendant sent a second letter of termination, citing multiple breaches of the Agreement:

- Failure to use commercially reasonable efforts to actively increase the placement of covered games as stated in Paragraph 2.1.

- Failure to maintain an inventory of spare parts in violation of Paragraph 4.1(a).

- Failure to comply with any of the duties and obligations in Paragraph 4.1(b).

- Failure to properly operate and account for the Escrow Account referenced in Paragraph 4.2 or to see that referenced third parties were paid from said account.

- Failure of O.S.G. to pay hundreds of thousands of dollars in invoices from P.O.M. [Pace-O-Matic] which are now far past due, in violation of Paragraph 4.2 of the Agreement.

- Breach of Paragraph 7.2 by actual or *de facto* attempt to assign all duties, rights, and obligations under the Agreement to Grant "Fuzzy" Kowell, not to mention the unconsented to relinquishment of ownership of O.S.G. by two of its shareholders.

- Failure to utilize Game Distributor Agreements in violation of Paragraph 7.3 of the Agreement.

The letter was dated February 22, 2008 and signed by Mark N. Poovey, an attorney for Defendant.

Breaches of the Agreement are covered in Section 5.1:

> Notwithstanding the foregoing, either party shall have the right to terminate this Agreement for cause at any time should the other party materially breach any covenant, representation or warranty made herein. Prior to a termination on such basis, the non-breaching party will provide the breaching party with written notice that the breaching party is not in compliance with this Agreement and such breaching party shall have thirty (30) days following such notice to cure the alleged default to the satisfaction of the non-breaking party; provided however, that if such breach cannot be cured within such thirty (30) day period, but (a) the breach is capable of cure, (b) the breaching party commences to effect a cure within such thirty (30) days period and (c) the breaching party diligently pursues such cure, such

party shall have a reasonable time to cure such default. Notwithstanding the foregoing, the non-breaching party may suspend performance under this Agreement during the cure period if the breach by the other party could reasonably be expected to result in a violation of applicable law.

Debtor filed a chapter 11 case on March 1, 2008. On April 24, 2008, Debtor filed an amended complaint initiating this adversary proceeding, seeking declaratory judgment "determining the rights, status and obligations of the parties to the Agreement," an accounting of funds collected by Defendant under the Agreement, and turnover of said funds. Defendant answered the complaint on May 19, 2008 and included counterclaims for declaratory judgment, breach of contract, recoupment, and accounting. Debtor now seeks to assume the contract; Defendant opposes the assumption. The Agreement contains a clause dealing with assignment.

> 7.2 <u>Assignment</u>
>
> This Agreement and the duties, rights and obligations arising hereunder may be assigned by a party hereto only with the prior written consent of the other party which consent may not be unreasonably withheld; provided, that Manufacturer may assign this Agreement to any party directly or indirectly controlling it, controlled by it or under common control with it. For the purposes of this Section, "control" means the ownership of a majority of the equity interest in the entity and/or voting control.

## **LAW AND ANALYSIS**

### **I.   Summary Judgment Standard**

Motions for summary judgment are governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56, and states, in applicable part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Bankr. P. 7056. The movant bears the initial burden of proof, being tasked with the "responsibility of informing the . . . court of the basis for its motion, and identifying those portions [of the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In reviewing the evidentiary materials, the facts and inferences arising therefrom are to be viewed in the light most favorable to the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). If the movant successfully demonstrates the

absence of apposite factual issues, the non-movant must refute the suggestion by establishing, from more than mere pleadings, the existence of facts giving rise to material questions. Celotex, 477 U.S. at 324 (referencing Fed. R. Civ. P. 56(e)).

## II. Assumption of the Agreement

Debtor seeks to assume the contract under 11 U.S.C. § 365(a):

> (a) Except as provided in section 756 and 655 of this title and in subsections (b), (c) and (d) of this section, the trustee[1], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Although Debtor may challenge the defaults listed in the termination letters, Debtor argues that the defaults are inconsequential because, as of the petition date, Debtor still had an opportunity to cure the defaults, relying on section 365(b):

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . ., and
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

Defendant opposes the assumption, arguing that Debtor's inability to assign the contract leaves it without the option to assume the contract. Defendant's position is founded on 11 U.S.C. §365(c):

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

---

[1] The parties do not dispute that the Debtor, as debtor-in-possession, can exercise the rights of the trustee. *See also* 11 U.S.C. § 1107(a).

> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to any entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment . . . .

The parties do not dispute the applicability of section 365, nor the existence of an executory contract. Defendant clearly does not consent to the assumption or assignment of the Agreement by Debtor. The basic issue is whether the contract can be assumed by Debtor. If the Agreement cannot be assumed, there is no reason to discuss cure of the Agreement.

The controversy between the parties is based on differing interpretations of section 365(c)(1)(A). Defendant, espousing the majority viewpoint, argues that since "applicable law" bars assignment of the underlying agreement, both assumption and assignment are prohibited. *See* Perlman v. Catapult Entertainment, Inc. (In re Catapult Entm't, Inc.), 65 F.3d 747 (9th Cir. 1999). Under this test, you presume that assignment is a foregone conclusion. As described in Catapult, "a debtor in possession may not assume an executory contract over the non-debtor's objection if applicable law would bar assignment to a third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party." Catapult at 750 (citing In re James Cable, 27 F.3d at 537 (characterizing § 365(c)(1)(A) as presenting "a hypothetical question"); In re West Elecs. Inc., 852 F.2d 79, 83 (same)). Actual intent is irrelevant.

Debtor's position is based on the minority viewpoint: that the agreement can be assumed under application of an "actual" test. *See, e.g.*, Institut Pasteur v. Cambridge Biotech, 104 F.3d 489 (1st Cir. 1997); In re Aerobox Composite Structures, LLC, 373 B.R. 135 (Bankr. D. N.M. 2007). Under this view, the actual intent of the party is material. If assignment is not contemplated, the applicable law cannot bar assumption.

The Sixth Circuit Court of Appeals has not rendered an opinion on this particular conflict, but it did expound on section 365 in Rieser v. Dayton Country Club Co. (In re Magness), 972 F.2d 689 (6th Cir. 1992), which is instructive. The Magness court specifically stated it was not addressing assumption: "we should make clear that we are not dealing with the right to *assume* the membership with all its baggage, thus permitting the debtor to play golf." Magness at 694. Assumption would have imposed duties, including the payment of dues, burdening the estate. In Magness, the chapter 7 trustee sought to assign, through an auction process, Debtor's golfing membership interest in a country club. The golfing membership interest was a special interest in the club because golfing memberships were limited in number, attendant with higher fees, and subject to specific transfer limitations. Members who wanted to advance to a golfing membership

were required to pay a substantial fee and be placed on a waiting list. If successful, the trustee's assumption of the contract and sale would have bypassed the club's golfing membership system, potentially allowing someone who was not on the waiting list to obtain a golfing membership.

The case discusses the inter-play between bankruptcy code sections 365(c)(1) and 365(f)(1). Generally, a trustee can assume an executory contract under 11 U.S.C. § 365(a). The same general principle exists, by virtue of 11 U.S.C. § 365(f)(1), for assignments. Section 365(c)(1) provides the exception to these general rules. In Magness, the court reconciled the duplicate use of "applicable law" in both 365(c)(1)(A) and 365(f), ultimately determining that the "applicable law" referred to in section 365(c)(1) "address[es] the interest of the non-debtor third parties, rather than law relating to general prohibitions or restrictions on assignment of executory contracts covered by § 365(f)." Id. at 696. The court ruled against the trustee, concluding that the club could not be forced to accept performance from third-parties because the contract was personal between the debtor and the club. As a result, the trustee could not assign the interest.

The court recognizes that Magness attempted to address the difference between "applicable law" in section 365(f)(1) and use of the same term in section 365(c)(1). However, the definition cannot change based on the fact that the term "applicable law" is not used in section 365(a). As a result, this court must follow the interpretation of the Magness court. The section 365(c)(1)(A) exception applies equally to assumptions or assignments, as the specific language demonstrates. Thus, the court finds that, under the facts presented, the proper way to read the exception is in the following light: the debtor may not assume the Agreement if applicable law excuses Defendant from accepting performance from or rendering performance to a non-debtor third party regardless of clauses in the Agreement governing the rights to assign or delegate duties. Because the assumption would maintain the parties relationship under the Agreement, this is not a situation where Defendant will be forced to accept performance from an unknown third party when it contracted for those services from Debtor. Essentially, this is also equivocates adoption of Debtor's position and employment of the actual test.

This understanding does not create an absurd result. Debtor wants to assume the Agreement. The Agreement is the soul of Debtor's business and the inability to capitalize on the Agreement forced Debtor into Chapter 11. There has been no discussion of assigning this contract to a third party. Rather, Debtor seeks to cure the alleged defaults and continue operating under the Agreement. The ability to assume the contract is key to Debtor's survival. Thus the court would be remiss in overlooking the assumption issue in favor of the assignment issue. This type of factual distinctions has been noted. See, e.g., Murray v. Franke-Misal Tech. Group, LLC (In re Supernatural Foods, LLC), 268 B.R. 759 n.30 (Bankr. M.D. La. 2001) (finding that application of the "actual test" under section 365(c) arises "exclusively within the Chapter 11 context, where a debtor in possession wishes to assume executory contracts to maintain them for the estate, if applicable law prohibits only assignment, assumption is allowable"). On facts where assumption alone is contemplated, not assignment, courts tend toward adoption of the

actual test, or an interpretation favoring assumption. *See* <u>Summit Inv. and Dev. Corp. v. Leroux</u>, 69 F.3d 608 (1st Cir. 1995) (following chapter 11 bankruptcy filings by two general partners, court rebuffed non-bankruptcy general partner's attempt to enforce ipso factor provision in partnership agreement); <u>In re Footstar, Inc.</u>, 323 B.R. 566 (Bankr. S.D.N.Y. 2005); <u>In re GP Express Airlines, Inc.</u>, 200 B.R. 222 (Bankr. D. Neb. 1996); <u>In re American Ship Bldg Co., Inc.</u>, 164 B.R. 358 (Bankr. M.D. Fla. 1994); <u>Texaco Inc. v. Louisiana Land and Exploration Co.</u>, 136 B.R. 658 (M.D. La. 1992); <u>In re Cardinal Indus., Inc.</u>, 116 B.R. 964 (Bankr. S.D. Ohio 1990). Consequently, the distinction between assuming for the purposes of assigning versus only assuming an executory contract are noteworthy.

In some cases, such as <u>Magness</u>, the two cannot be severed because the inability to assign the contract would result in rejection. This is most notably seen in chapter 7 cases where a trustee seeks to sell the estate's interest in a contract but has no intention of performing under the contract. In a situation involving a chapter 7 trustee, the section 365(c)(1) exception would alleviate a party from accepting performance from, or rendering performance to, a chapter 7 trustee, thereby protecting the "personal" nature of the contract.

Allowing "applicable law" to drive the assumption determination, when said law may be entirely inapplicable, would allow creditors a potential windfall through a fast exit from their duties and obligations. Here, if Debtor cannot assume the contract, the likelihood of successful reorganization plummets. Allowing Debtor to assume the contract merely puts the parties in the position they were in on the day the bankruptcy was filed, leaving them both with the benefits, and detriments, of their bargain.

Defendant wants to be relieved of this contract by relying on "applicable law" that prevents assignment. Upon review of the Agreement, this would provide Defendant *more* relief than contracted. The Agreement does not prohibit assignment, but merely conditions it: "This Agreement and the duties, rights and obligations arising hereunder may be assigned by a party hereto only with the prior written consent of the other party which consent may not be unreasonably withheld . . . ." This is not a case where assignment was prohibited outright, but adopting Pace's position would have that result.

Considering all of the above, the court finds that, as of the petition date, Debtor could assume the contract subject to the default conditions set forth in 11 U.S.C. § 365(b). Section 365(c)(1)(A) is not a bar to assumption on the facts of this case.

### III. Cure of the Agreement

After finding the Agreement can be assumed by Debtor, the court must now address the default issues raised by the parties. Section 365(b) contains three requirements for effectuating a cure of prepetition defaults: (1) cure the default, or provide adequate assurance of a prompt cure; (2) compensate, or provide adequate assurance of such compensation will be made, to a party who has suffered an "actual

pecuniary loss;" and (3) "provide adequate assurance of future performance." Debtor alleges it can provide the necessary compensation or adequate assurance to provide a cure under section 365(b), while Defendant disagrees. With regard to any monetary defaults, Debtor contends that the money Pace collected for Debtor under the Agreement could be used to cure the defaults. Defendant points out that Debtor has essentially ceased to exist, has no employees or operations, no money, and further argues that certain items simply are not capable of cure. Defendant argues that it is impossible for Debtor to provide adequate assurance of future performance because Debtor does not have qualified personnel to operate the business. It is clear that Defendant objects to Mr. Kowell taking over duties previously handled by Jay Young. The court will review the allegations of default individually.

Section 5.1 of the Agreement requires a party to provide written notice of termination for a "material" breach and allow the breaching party a minimum thirty days to cure the alleged breach. It is clear that prior to Debtor's filing, two termination letters were issued. The first was signed by Pace. It is attached as Exhibit D to Debtor's motion for summary judgment and is undated. Debtor claims that it received this letter "sometime in the first week of February." (Debtor's M. Summ. J., p. 7). Defendant does not dispute this contention, or argue for an earlier date, so the court will find that Debtor had notice of the termination on February 7, 2008. Consequently, as of the filing date of the petition, time remained for Debtor to cure the Agreement. Similarly, a second letter of termination was issued on February 22, 2008, so time to cure the breaches referenced in that letter also remained as of the petition date. The Agreement was not terminated prior to Debtor's bankruptcy filing.

In the first letter, Defendant cites the transfer of ownership of Debtor from Mildred Kowell to her husband as a breach. This is reiterated in the second letter, where Defendant cites a "[b]reach of Paragraph 7.2 by actual or *de facto* attempt to assign all duties, rights, and obligations under the Agreement to Grant "Fuzzy" Kowell, not to mention the unconsented to relinquishment of ownership of O.S.G. by two of its shareholders." (Debtor's M. Summ. J., Exh. D and E). Paragraph 7.2 governs assignment of the Agreement and does not prohibit the action complained of by Defendant. The clause governs assignment of the Agreement, not a transfer of stock by owners of one of the contracting parties. The change of ownership of Debtor did not alter the Agreement, nor the identity of the parties to the Agreement. The Agreement was made by Ohio Skill Games, Inc., not with an individual. The court finds no foundation for the alleged breach. At a minimum, it is not a "material" breach under the Agreement. Consequently, no cure is required.

The first letter also contains a general allegation that Debtor was failing to perform the "distribution functions or other duties required of Ohio Skill Games under the Agreement." (Debtor's M. Summ. J. Exh. D). This apparently relates to Debtor's obligations under Section 2 of the Agreement. However, the allegation of breach is vague. The second letter is more specific, but references one breach of Section 2: "[f]ailure to use commercially reasonable efforts to actively increase the placement of

covered games as stated in Paragraph 2.1." Under Section 2.2, the Agreement states: "[t]he minimum net Covered Game Placement requirements for Ohio have already been met."[2] No maximum requirements are established in the Agreement, nor are additional benchmarks outlined. As a result, Defendant's position is untenable. The court finds that when the Agreement was signed, Debtor had placed the required number of games in Ohio and thereby satisfied its obligations under Paragraph 2.1. The Agreement failed to establish any further performance benchmarks.

The bulk of the remaining items of default relate to Debtor's duties under Section 4 of the Agreement, titled "Game Servicing." The alleged breaches include:

- Failure to maintain an inventory of spare parts in violation of Paragraph 4.1(a).

- Failure to comply with any of the duties and obligations in Paragraph 4.1(b).

- Failure to properly operate and account for the Escrow Account referenced in Paragraph 4.2 or to see that referenced third parties were paid from said account.

- Failure of O.S.G. to pay hundreds of thousands of dollars in invoices from P.O.M. [Pace-O-Matic] which are now far past due, in violation of Paragraph 4.2 of the Agreement.

Additionally, Defendant claims a breach of Section 7.3: "[f]ailure to utilize Game Distributor Agreements in violation of Paragraph 7.3 of the Agreement."

Questions of fact abound in ascertaining whether these alleged defaults can be cured. For example, Debtor contends it has an inventory of spare parts and, to the extent Defendant finds it inadequate, it is willing to acquire an amount sufficient to cure the default. No supporting documentation has been was provided to describe Debtor possessed when the termination letter was issued, nor are their specifics on the how, or why, the parts inventory was deficient.

Further, the parties did not provide an itemization of the amounts collected by Defendant following seizure of Debtor's assets. To the extent that Debtor relies on those monies as both a cure and adequate assurance, the amount is material. It is also pertinent to Defendant's claims that hundreds of thousands of dollars are due to Defendant. The other items similarly involve questions of fact which are not appropriate for the court to decide on a motion for summary judgment.

## CONCLUSION

Since Debtor is not contemplating assignment, 11 U.S.C. § 365(c)(1) does not bar assumption. However, Debtor's ability to assume is subject to its ability to cure the

---

[2] The only issues presented in this adversary pertain to the Ohio activities.

defaults as outlined in section 365(b). Questions of fact preclude summary judgment on the issue of whether Debtor can effectuate a cure. Consequently, the Court will grant, in part, Debtor's request for summary judgment on count one, the declaratory judgment count. Assumption of the Agreement will be approved subject to section 365(b). In the same vein, Defendant's motion for summary judgment will be denied.

Debtor also moved for summary judgment on count three of its amended complaint seeking turnover. The court finds Debtor failed to fully develop arguments on this issue, instead focusing on count one. As a result, the Court finds that Debtor did not establish either the absence of genuine issues of material fact or its entitlement to judgment as a matter of law on count three. Consequently, the motion for summary judgment will be denied as it pertains to the count for turnover.

An order will be entered forthwith.

#   #   #

**SERVICE LIST**

Michael J Moran
Gibson & Lowry
PO Box 535
234 Portage Trail
Cuyahoga Falls, OH 44222

Jean R. Robertson
Ronald M. McMillan
Calfee, Halter & Griswold LLC
1400 KeyBank Center
800 Superior Avenue
Cleveland, OH 44114

Jeffrey L. Tarkenton
Womble Carlyle Sandridge & Rice PLLC
1401 Eye St., N.W.
7th Floor
Washington, D.C. 20005